[Civ. No. 9546. First Appellate District, Division One.—July 16, 1936.]

WILLIAM EATON, an Insane Person, etc., Plaintiff and Appellant, v. L. O. THIEME, Defendant and Appellant.

Ralph O. Marron, E. B. Power and R. Lee Chamberlain for Plaintiff and Appellant.

Dinkelspiel & Dinkelspiel, J. Thaddeus Cline and Harold W. Conklin for Defendant and Appellant.

THE COURT.—The plaintiff, an insane person, brought this action through his guardian, E. G. Twogood, to recover from the defendant, L. O. Thieme, the sum of $15,085.71, of which $4,333.33 was claimed as an undisclosed profit obtained by defendant in the transaction of plaintiff's business, and the remainder as an unpaid balance of money collected by defendant as agent of the plaintiff. Judgment was entered, upon an instructed verdict, awarding to the plaintiff the last-named amount only, together with interest. Both parties appeal,—the defendant from the judgment in so far as it gives to the plaintiff any sum whatever, and the plaintiff in so far as it denies him the remainder of the amount prayed for.

We will first consider the appeal of the plaintiff.

The obligation on which the plaintiff sued is based upon a written contract between him on the one part, and the defendant and one Eugene W. Levy on the other. The defendant is a resident of the state of Illinois engaged in business connected with the estates of deceased persons, including searching for possible heirs and the presentation and enforcement of their claims. In the year 1925 there was pending

in the circuit court of Illinois a proceeding for setting aside the probate of the will of William Nelson McClintock, who had died leaving a large estate. He had no immediate relatives, and by his last will and testament had bequeathed or devised all his property to a friend or friends. By the efforts of various attorneys or persons engaged in the business of discovering heirs nine persons had been assembled who might possibly be cousins of the deceased, and the proceeding to set aside the will of McClintock had been instituted by these persons and another. Through investigations into the family history of McClintock the defendant was led to believe that the plaintiff William Eaton, who was confined in the state hospital at Agnew, was a cousin of the deceased, and he initiated steps and entered into negotiations by which E. G. Twogood was appointed guardian of the estate of William Eaton and which culminated in the execution of the above-mentioned agreement, dated June 9, 1925. Defendant's associate in that contract, Eugene W. Levy, was a practicing attorney in San Francisco, and it devolved upon him to negotiate the contract with the plaintiff's guardian. This duty he performed through the intermediary of his son David Livingston, also an attorney at law, who practiced in association with his father. The contract when finally negotiated was approved by the Superior Court of the City and County of San Francisco, in which court the proceedings for the appointment of the plaintiff as Eaton's guardian had been taken, and in connection with the contract and as a part of the transaction Twogood gave to the defendant a power of attorney, which was approved by said superior court.

The contract, so far as material to the determination of the present question, reads as follows:

"Whereas, the parties of the second part have rendered services and have advanced money for necessary expenses and do now agree in the future to render services, advance money for court costs and for other necessary expenses in such behalf and to present and prosecute the claim of said William Eaton in and to said estate;

"Now, therefore, It Is Hereby Agreed by and between the parties hereto that said William Eaton does hereby assign, transfer and set over to the said parties of the second part and that said parties of the second part shall receive and

may retain from any and all funds and property collected or received for said William Eaton a one-third part and portion of the subject matter of said written instrument or power of attorney above mentioned, and of all the right, title and interest of said William Eaton in and to said estate which said William Eaton may now have or which he may hereafter assert and establish after deducting therefrom any and all court costs and taxes incurred or paid in the performance of said power of attorney and this contract; it being the intention of the parties that the party of the first part does assign and the parties of the second part shall receive one-third of net amount to which the party of the first part may be entitled and which shall be distributed to him; provided however that all expenses other than court costs and taxes shall be paid out of the one-third of the net estate hereinabove assigned to the parties of the second part.''

Acting under the authority conferred upon him by this contract and power of attorney the defendant procured for himself appointment as guardian *ad litem of* William Eaton by the Illinois court in which the above-mentioned proceeding was pending, and made common cause with the said nine persons claiming to be cousins of the deceased in their attack upon the will. The contest resulted in a compromise agreement between the parties thereto, by which a consent decree was entered, under which there was distributed to the plaintiff herein property of the value of $70,000, of which one-half was cash or securities and the other half real property located in Chicago. The real property is not involved in the case before us. The sum of $35,000 being received by the defendant, he purported to account for it to the plaintiff. In doing so he deducted, under the guise of court costs, among other amounts (not here in question) the sum of $13,500, which the Illinois court had allowed as attorneys' fees to certain attorneys employed by defendant to represent him in the proceeding to set aside the probate of the will, or appointed by the court to represent his successor as guardian *ad litem* in that proceeding.

It is the plaintiff's contention on his appeal that this was not a proper deduction; that under the terms of the contract the defendant was responsible for attorneys' fees, and that through this deduction the plaintiff's share in the net re-

covery (i. e., the gross recovery less court costs and taxes) has been diminished by two-thirds of the amount of this unauthorized deduction, namely, $9,000. We are thus presented with the question of the correct construction of the contract.

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting so far as the same is ascertainable and lawful." (Civ. Code, sec. 1636.)

██ "For the purpose of ascertaining the intention of the parties to a contract, *if otherwise doubtful,* the rules given in this chapter are to be applied." (Civ. Code, sec. 1637.)

We emphasize the words of this section "if otherwise doubtful" since they plainly exclude the application of the rules referred to if the intention of the parties to the contract is plain upon its face.

██ We think such is the case here. The contract is one of a very common variety entered into by attorneys or speculators on the one part, and persons claiming some right of action which they are either unable or unwilling to prosecute at their own expense, on the other, and by which the attorney or speculator undertakes to render legal or other services, either personally or through an agent, and to take his compensation in the form of a stated proportion of the amount recovered if a recovery be effected. Frequently in such a contract he agrees to pay or advance the necessary expenses, to be reimbursed only in the event of recovery.

The contract before us requires of the defendant two things, viz., (1) "to present and prosecute the claim of said William Eaton in and to said estate"; (2) to "advance money for court costs and for other necessary expenses". The first obviously requires him to render, either personally or through attorneys employed by him legal services, for which and other services he is contingently compensated by the assignment to him of "one-third of the net amount to which the party of the first part may be entitled and which shall be distributed to him"; the second requires him to advance money, of which only that paid or advanced for court costs and taxes are to be reimbursed to him out of the gross recovery before its division into one-third and two-thirds. The inference seems plain that the defendant is not entitled to claim as court costs fees allowed or paid for legal services

which he was obligated by the contract to render or furnish and in consideration of which and other services he was assigned a one-third interest in the amount to be recovered.

It is true that in exceptional cases attorneys' fees are included in the term "court costs", but they are not included in the common acceptation of that term, and especially should they not be so regarded under a contract which plainly undertakes to exclude them therefrom.

If we are correct in our conclusion that this is the plain meaning of the language of the agreement, that part of the judgment from which the plaintiff appeals should be reversed and the trial court directed to enter judgment in his favor for the additional amount to which the proof in the court below showed the plaintiff to be entitled.

Although what we have said is sufficient to dispose of plaintiff's appeal, it may not be inappropriate to consider the further contention of the plaintiff that the trial court committed prejudicial error in certain of its rulings rejecting proffered evidence tending to show that the construction of the contract above indicated is that which was in fact intended by the parties.

Assuming that the intention of the parties to the contract is doubtful, then under section 1637 of the Civil Code above quoted the rules given in title III, entitled "Interpretation of Contracts" and comprising sections 1635 to 1661 inclusive, are to be applied—although it may be said in passing that section 1654 is given a restricted application, only coming into operation when, after application of the rules formulated in the sections preceding it, the uncertainty has not been removed.

Under section 1647, authorizing the introduction of parol evidence to show the circumstances under which a contract was made, evidence tending to prove that in the negotiation of the contract the defendant had drafted and tendered for execution a form of contract which provided that all expenses incurred should be deducted from the gross recovery before its division between the parties, was offered by the plaintiff; that this provision not being acceptable to Twogood, plaintiff's guardian, he wrote a letter to David Livingston, through whom the draft had been presented, in which he stated: "As I would have no control over the amount of expense that might be incurred by the parties of the second part, I feel

I should limit the costs to be assessed to my ward *to those that are usually known as court costs, that is, such costs and expenses as would be taxed against a losing party by the court in a civil action"*; that thereupon this amendment to the contract was accepted and its language changed to that which we have seen it now contains. This evidence was rejected by the court.

 The plaintiff further offered, as tending to prove that the defendant himself understood that the intention of the parties to the contract was that contended for by the plaintiff, an answer filed by the defendant in the Illinois court to a petition presented therein by one Solberg (an attorney theretofore employed by defendant to represent him in the proceeding but whom he had discharged) for an allowance of fees from the sum decreed to be distributed to the plaintiff. In this answer the defendant categorically stated that he himself was responsible for attorneys' fees incurred in prosecuting the plaintiff's claim in that court, and that the court was not authorized to allow them directly to the attorney out of the fund adjudged to belong to the plaintiff. While this answer was not signed or verified by the defendant but by his attorney, it was nevertheless authenticated by him by inclosing a copy of it in a letter to David Livingston, in which he stated that it was his answer in said proceeding. That a formal and solemn declaration of this character, so obviously against the interest of the defendant in the present proceeding, was admissible as his own construction of this contract before the controversy arose is too plain for argument.

 Both these pieces of evidence were excluded by the trial court upon the theory—which it adopted early in the trial—that section 1646 of the Civil Code should be applied in the interpretation of the contract, and that such application excluded that of other code sections, particularly of section 1647.

Section 1646 reads: "A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." As the contract here involved showed upon its face that it was to be performed, at least partly, in the state of Illinois, and it appeared that according to the law of that state at-

torneys' fees incurred by the guardian *ad litem* of an insane person in a proceeding of the character of the one in which the defendant intervened in the performance of this contract, were permitted to be allowed against and charged to a recovery by the guardian *ad litem* in that proceeding as court costs, the trial court ruled any further inquiry into the intention of the parties was foreclosed.

In this we think the court erred. Section 1637 of the Civil Code above quoted plainly indicates that all the appropriate sections included in the title are to be given application; and the same conclusion would follow from the fact that the sections are the enactment of rules previously established and followed by the courts of common law. (*United Iron Works* v. *Outer Harbor etc. Co.*, 168 Cal. 81, 84 [141 Pac. 917].) The defendant cites the case of *Flittner* v. *Equitable Life Assur. Society*, 30 Cal. App. 209 [157 Pac. 630], as holding that the presumption supplied by section 1646 in the interpretation of contracts is conclusive. He refers to a quotation found in that case from the Kentucky case of *Short* v. *Trabue*, 4 Met. (61 Ky.) 299, in which it is so stated. The District Court of Appeal, however, was not citing the Kentucky case to the point of the conclusiveness of the presumption. The question was not involved in the case; and the writer of the opinion immediately proceeds to cite another case in support of the point then being considered (*Seiders* v. *Merchants' Life Assn.*, 93 Tex. 194 [54 S. W. 753]) to the effect that the law of the place of performance must be followed "unless there be something in the circumstances that indicates that the parties contracted with reference to the place where the contract was made".

This evidence which the trial court excluded completely rebutted the presumption of section 1646, and was sufficient, if admitted, to have justified or even required a finding or verdict that the term "court costs" as used in the contract here involved was not intended to include attorneys' fees. We may add that no right of either of the parties under the Illinois law was involved except as that law was invoked for the purpose of determining their common intention in the employment of the term "court costs".

The exclusion of this evidence would entitle the plaintiff to the reversal of the judgment and a new trial were it not

for the fact that for the reasons already given he is entitled to a reversal with directions to enter judgment in his favor.

We come now to the appeal of the defendant, which is taken from the judgment against him for the sum of $4,333.33 and interest entered upon a directed verdict.

This amount is two-thirds of a sum of $6,500 paid to the defendant by the law firm of Taylor, Miller, Busch and Boyden, attorneys for the nine heirs, in pursuance of an understanding arrived at between them and the defendant on September 9, 1929, with the approval of the attorneys representing Isabelle Pope (another claimant for a share of the decedent's estate), and those representing William D. Shepherd, the executor of the last will and testament of McClintock and the principal beneficiary under his will. The object and nature of the payment is stated in a letter under said date written by said firm of attorneys to the defendant, and which the latter surrendered to them upon said payment being made to him on January 2, 1930, with his receipt therefor indorsed thereon. The letter is brief and is in the following terms:

"Estate of William Nelson McClintock, deceased.

"The undersigned, as attorneys for nine heirs of William Nelson McClintock, deceased, hereby confirm our understanding that out of $400,000 to be paid the said nine heirs and Isabelle Pope in cash and securities as provided in a certain contract of settlement, as approved by all of the parties to-day, you are to receive the sum of $6,500 to reimburse you for certain costs and expenses in connection with the proof of heirship and other proceedings in connection with the above estate. It is understood that this payment will be made at the time of the other payments provided for in said agreement."

The contract of settlement mentioned as having been approved by all the parties on September 9, 1929, is dated two days thereafter, and the defendant, as attorney in fact of E. G. Twogood, plaintiff's guardian, was one of those parties; and this contract, after having been executed by the plaintiff in such capacity, upon petition to and approval by the Illinois court in which the matter of said estate was pending, formed the basis of the decree of that court setting aside the last will and testament of McClintock and distributing his estate to William D. Shepherd, Isabelle Pope, the nine heirs and the plaintiff.

Some year or more before the writing of the letter of September 9th to the defendant the attorneys for William D. Shepherd, lsabelle Pope and the nine heirs had composed their differences and had reached an agreement that said heirs and Isabelle Pope should receive in satisfaction of their claims the sum of $400,000, to be divided between them in agreed proportions, except a sum of $20,000 thereof, which it was agreed should be devoted to defraying expenses incurred in the establishment of those claims. The defendant, on learning of this proposed expense fund, urged that he ought to be allowed to participate in it since, as he claimed, his efforts in connection with the attack on McClintock's will had resulted in the elimination from the contest of certain claimants, to the advantage not only of the plaintiff but of the nine heirs and Isabelle Pope. Negotiations ensued, resulting in the understanding embodied in the letter of September 9th. It is the claim of defendant that the ''certain costs and expenses in connection with the proof of heirship and other proceedings. in connection with the above estate'' referred to in said letter are such as were incurred by him in securing proof which eliminated from the contest for participation in the McClintock estate certain claimants in the United States and Sweden. While there is no proof that such expenses were in fact so incurred, this claim is itself an admission that this sum of $6,500 was paid to defendant in consideration of performing services of the precise nature of those required of him under his contract with plaintiff's guardian; for it is not pretended that the defendant incurred these expenses at the request of anyone or that anyone was liable to him for their reimbursement; and, on the other hand, it is quite clear that his disbursements in that amount were merely used as a measure of compensation to him for services which incidentally resulted in benefit to the parties who finally undertook to bear them. By his contract with the plaintiff's guardian the defendant undertook to ''present and prosecute the claim of said William Eaton in and to said estate''. As the result of his investigation into the McClintock pedigree the defendant became convinced that the plaintiff and one other were the only true heirs of the deceased. Accordingly, under his contract with plaintiff's guardian, he was obligated to present and prosecute a claim

for a full one-half of the estate, and this he could only do by resisting all false or dubious claims.

This brings us to the first contention of the defendant in support of his appeal, namely, that the trial court committed reversible error in its refusal upon motion to strike out certain material testimony of Preston Boyden, a witness for the plaintiff, given on direct examination, when it developed on cross-examination that it was based on hearsay.

The examination of this witness, both direct and cross, is set out in defendant's brief, and it is necessary to examine it in order to ascertain what parts of it are subject to the objection urged.

This witness was a member of the law firm of Taylor, Miller, Busch and Boyden, and is the person who wrote the letter of September 9th to the defendant and who was in active charge of the preparation of the case for his firm. He testified that his firm had negotiations with the defendant in the spring and summer of 1929 and part of 1928. Asked to state what the negotiations were which led to the letter of September 9th being written to the defendant, he stated that his recollection was that the parties in interest other than the defendant had reached an agreement; that the defendant told the firm or communicated to it in some way in the year 1928 that he had information which seemed to indicate that clients of the firm were not the true heirs of the deceased; there was a considerable hearing on heirship, a number of conferences between the interested parties of the defendant and interested parties on his firm's side, with himself and partners, and attorneys representing Isabelle Pope, whose interests were substantially the same as theirs; that the negotiations with the defendant led to the question of a settlement, and a settlement was finally arrived at whereby the defendant's heirs were to receive $70,000, more or less, in cash and property, and the defendant was to receive the sum of $6,500; that prior to September 9, 1929, the defendant had not agreed to any settlement on behalf of the plaintiff's guardian. The question of a payment to the defendant of $6,500 or any other amount was brought into the negotiations, according to his recollection, in the spring of 1929; that his recollection was that it was brought up when the whole subject came up of the payment to the defendant's heir and to himself, a considerable time before September,

1929. He was uncertain as to what the defendant's first asking price for his client was, his recollection being that at the very beginning he claimed he was entitled to one-half of the estate; his position was that if he was correct about the heirship his client was entitled to one-half of the estate. From that point various negotiations took place, which culminated in the settlement of $70,000 for his client. With respect to the defendant's demands for himself he first asked the sum of $10,000. This sum was later by negotiations of all parties reduced to $6,500, and his letter of September 9, 1929, was the result of those negotiations, his recollection being that that letter was for all practical purposes simultaneous with the settlement with the defendant on behalf of his ward. The actual settlement was fixed by decree of court on December 30, 1929.

On cross-examination the witness stated: He did not think he testified that the conversation with the defendant on the subject of $6,500 or $10,000 was had with himself; that his answer was, or should have been, that negotiations were had with the defendant, between his (the witness') firm and Kirkland's firm and Deneen's firm; as to exactly who carried them on he did not know; he thought he was with the defendant once. Those negotiations were carried on with the defendant by Mr. Busch of his firm; he believed they were not successful and Mr. Keplinger, of Mr. Kirkland's firm, who was interested in the settlement, carried them on after that. There were three members in his firm, two in Senator Deneen's firm, and Mr. Keplinger, all interested in this problem; and the negotiations with the defendant, he thought, in the last stages that led to the closing, were carried on by Mr. Keplinger, according to his recollection. He would report back to the interested parties any conferences, and at each time they would tell Mr. Keplinger what their reactions were to it; that is all he meant to say by his statement, and in that way he would be the person who would write the letter, that is, the interested lawyers were coming together on the points of negotiation, and they would decide. What was to be done or said by the defendant or his heirs would be reported to them, and when the settlement was negotiated he (the witness) was the logical person to write the letter because he was in active charge of the preparation of this case for his office. (On motion of defendant's attorney the word ''logi-

cal'' was stricken out.) Resuming, the witness testified: That according to his recollection the defendant never asked him personally for $10,000; his recollection was that he was present at one conference at which this question of what the defendant wanted to cover his expenses was raised, and that that was one of the early conferences at which the amount of $10,000 was mentioned, he certainly could not say that the defendant asked him individually for it. It is a fact that Mr. Keplinger of Kirkland's firm agreed to pay witness' firm and Deneen, Healy and Lee $20,000 for expenses in the matter, and the money was actually paid; he believed that was paid to his firm and Deneen, Healy and Lee; he thought he was not present at any conference or conversation when the defendant demanded $10,000; he knew nothing about that except as he had testified, except as his partners may have told him; that the defendant never demanded any money of him at all except as he had testified; that the defendant never asked him at any time in the McClintock estate for money for any purpose, that all he knew about it was what somebody else told him.

The record then discloses the following:

"Mr. Goodman (defendant's counsel): Now I move to strike out all the testimony of Mr. Boyden with relation to the payment of any money whatsoever to Mr. Thieme on the ground that the witness has stated that Mr. Thieme never demanded any money of him for any purpose, that he was never present at any time when Mr. Thieme demanded money of anybody, and that all the knowledge he has on the subject is what somebody else told him.

"The Court: He says, 'My recollection is that I was present at one conference.'

"Mr. Goodman: I realize he did say that, but he says afterward—

"The Court: Counsel, I will admit it is apparently contradictory, and it is a matter of argument to the jury. If he says one thing here and one thing there, what in the world does he mean? It is apparently contradictory, and they haven't gone into it in detail."

Assuming that some of this witness' testimony was subject to the objection of being hearsay, it is nevertheless apparent from the record that the court's action in retaining it was without prejudice, since the making of the demand

in question is not disputed by the defendant. He admits it, and his only contention with respect thereto is that the payment to him which resulted from it had nothing to do with his employment as plaintiff's agent or with his duties under his contract with Twogood.

This conclusion brings us to defendant's second and final points, namely, that the evidence is insufficient to support the verdict in favor of the plaintiff, and that the trial court committed error in directing the jury to return it.

We have seen that the defendant, under his contract with the guardian of plaintiff undertook to present and prosecute plaintiff's claim to a share in the estate of McClintock as an heir at law, and in that behalf to pay with certain exceptions the expenses involved in the establishment of plaintiff's heirship. This was his only employment in connection with the estate, and as a witness in his own behalf he testified that whatever services he rendered were for the purpose of protecting the interests of plaintiff. He kept but one account of his expenditures in connection with the matter, an inspection of which shows many items which on their face were incurred in the execution of his contract with plaintiff's guardian Twogood. In the proceeding pending in the Illinois court a hearing had been had, at which the status of the plaintiff and said nine other heirs had been established and the proceeding then indefinitely continued; following which the arrangement already detailed between Shepherd, the nine heirs and Isabelle Pope was entered into. This arrangement was tentative, and was dependent upon an agreement of settlement with the defendant in behalf of plaintiff being made. Upon learning that this arrangement provided that out of the gross amount to be paid $20,000 was to be set apart to meet the attorneys' fees and expenses incurred by the ten persons concerned in it in the establishment of their claims, the defendant urged upon their attorneys that he ought to be reimbursed the expenses he had incurred in establishing heirship from this fund. In this behalf the defendant testified: ''I learned that the firm of Taylor, Busch and Boyden received the sum of somewhere around $20,000 to cover the costs and expenses of the proof of heirship, and I informed Mr. Taylor that I felt I was entitled to be reimbursed out of the funds that they received for that purpose, as I was instrumental in establishing the

heirship.'' By ''establishing the heirship'' defendant referred to the circumstance that as the result of his investigations and efforts certain claimants to the estate had been eliminated, to the advantage, of course, not only of the plaintiff but of all other successful claimants to the estate. ''This letter,'' says he (referring to the letter of September 9, 1929, heretofore set out in full in this opinion), ''was the result of my conferences with Mr. Taylor as to reimbursement for cash expenditures had.'' In said letter, it was agreed, as we have seen, that the defendant should be paid from this fund the sum of $6,500 as such reimbursement; but this payment, as appears indirectly from the terms of the letter, and directly from the testimony of W. A. Keplinger, one of the attorneys for the executor and principal beneficiary under the will, was contingent upon confirmation by the court of an agreement by the defendant, negotiated contemporaneously therewith, on behalf of plaintiff, to accept in·settlement of his claim of heirship the sum of $70,000. The defendant reported the latter settlement to the plaintiff's guardian without disclosing, however, the arrangement by which he was to be paid this $6,500. The proposed settlement was accepted by said guardian, reported by the defendant to the court, approved by the court, and, by agreement of all parties interested, the decree setting aside the probate of the will and distributing the estate already referred to herein was entered.

The trial court took the view that this payment to the defendant was a secret profit received by him while acting in a fiduciary capacity toward the plaintiff, and which he could not equitably retain but must account for it to the plaintiff.

In this we have no doubt the court was entirely correct. Moreover, it was not only a secret profit, but it was received from persons whose interest in the transaction was adverse to that of the defendant's principal, and its payment was contingent upon the acceptance by the principal of the terms of the compromise negotiated by the defendant. By stipulating for this payment to himself the defendant took a position which in the view of the law prevented him from putting forth his best efforts in the performance of the task entrusted to him, and thus violated his trust.

"The relation of an agent to his principal is ordinarily that of a fiduciary, and as such it is his duty in all dealings concerning or affecting the subject of his agency to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal. So sedulously is this principle guarded that all acts if an agent which tend to violate his fiduciary duty are regarded as frauds upon the confidence bestowed, and are not only invalid as to the principal but are also against public policy." (2 Cor. Jur., Agency, sec. 353, p. 692.)

The decisions of our highest court fully sustain this principle. (*Western States Life Ins. Co.* v. *Lockwood,* 166 Cal. 185 [135 Pac. 496]; *Estate of Parker,* 200 Cal. 132 [251 Pac. 907]; *Purdy* v. *Johnson,* 174 Cal. 521 [163 Pac. 893]; *Farmers & Merchants' Bank* v. *Downey,* 53 Cal. 466 [31 Am, Rep. 62].)

We conclude that there was no error on the part of the trial court in directing the jury to find a verdict for the plaintiff for $4,333.33 (being two-thirds of said sum of $6,500) with interest, and that the verdict is sustained by the evidence.

It results from the foregoing that that part of the judgment in favor of the plaintiff for $4,333.33, with interest thereon at the rate of seven per cent per annum from January 2, 1930, to wit, the sum of $5,352, should be affirmed; and that that part of said judgment denying to the plaintiff a recovery in excess of said sum should be reversed, and the cause remanded to the superior court with directions to enter judgment in favor of the plaintiff for such further sum as is shown by the evidence, viewed in the light of the views herein expressed, to be due him. It is so ordered.

A petition by defendant and appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 14, 1936.