[Civ. No. 17892. First Dist., Div. Two. Aug. 11, 1958.]

WILLIAM EDWARD MAERTINS, Appellant, v. KAISER FOUNDATION HOSPITALS (a Corporation) et al., Respondents.

Edises, Treuhaft, Grossman & Grogan, Edward R. Grogan and Henry M. Elson for Appellant.

Carlson, Collins, Gordon & Bold, Robert Collins and John Ormasa for Respondents.

DOOLING, J.—Plaintiff brought this malpractice action alleging failure of Dr. Paul Pfeiffer to discover and treat a tubercular condition in his left lung. Plaintiff was a subscriber to the respondent Kaiser Foundation Health Plan, a nonprofit trust which collects premiums for prepaid medical care by respondent Permanente Medical Group, a partnership of doctors, at hospitals owned and maintained by respondent Kaiser Foundation Hospitals, a corporation.

This is an appeal from a judgment for defendants.

In December of 1952 appellant failed to pass an army induction physical because of a heart murmur. He was advised at that time to have this heart condition evaluated and he made an appointment to see Dr. Pfeiffer, an internist specializing in the field of cardiology at respondent hospital.

On January 9, 1953, Dr. Pfeiffer took appellant's medical history, examined him, fluoroscoped him and sent him to the X-ray department for a chest film. A written interpretation of this X-ray by Dr. Ethel Stuteville, a radiologist, stated:

"Views of the chest show the heart normal in size, shape and position. The lung fields show an area of infiltration in the mid-lung zone on the right. It is suggested that the patient be evaluated for possible lung disease, and if necessary, that serial films be made, taken at intervals of approximately 3 months governed by the clinical findings." Although Dr. Pfeiffer noted that the fluoroscopy revealed that "hilar markings appear accentuated," he made no comments about the radiologist's report. Dr. Bolomy, chief of the Department of Cardiology at the Kaiser Foundation Hospital and chief of the cardiovascular clinic of the Permanente Medical Group in Oakland, testified: "Automatically, in the cardiovascular department, whenever a patient has an appointment on any particular day, his entire X-ray file is sent to the cardiovascular department for the cardiologist to see." Appellant was not advised of the radiologist's findings and no tests for lung disease were made.

Appellant next saw Dr. Pfeiffer on March 13, 1953. A notation in his medical record indicates that he failed to keep an appointment on March 6. At this time the heart murmur was noted as being "much less noticeable" and that appellant had a "slight degree of sternal depression." There was also the notation "3 mos." which was interpreted by respondents' witnesses to mean that appellant was to return in three months but appellant testified that he had no recollection of being told to return in three months.

Dr. Pfeiffer next saw appellant on October 30, 1953. At this time appellant was told that his heart murmur was "hardly noticeable." The medical record contains the notation: "murmur as before." An X-ray was taken. The written interpretation by the radiologist of this film states: "Re-ray of the chest shows the heart normal in size, shape and position. Infiltration previously reported in the right mid-lung zone has been almost completely cleared."

On December 11, 1953, appellant was again examined by Dr. Pfeiffer and was told that his heart murmur was functional and not congenital. A notation in appellant's medical record states, "Doing well. Murmur very insignif. . . . Probably no heart disease." At this time appellant was told to return if he developed a bad cold.

In late December 1953, appellant developed a cold and returned to see Dr. Pfeiffer on January 15, 1954. He had a cough, a sore throat and was running a temperature and had

lost weight. A diagnosis of bronchitis was made and another X-ray was ordered by Dr. Pfeiffer. Appellant was examined by Dr. Pfeiffer on January 22, 1954, and a notation was made that his temperature was 100 degrees and that he "had a cough productive of a little phlegm a few days ago, none now."

On January 25, 1954, appellant was referred to Dr. Donald Ash, a chest specialist at the Kaiser Foundation Hospital in Richmond. Dr. Ash ordered a tuberculin skin test and other laboratory tests. His diagnosis was that appellant had tuberculosis. Using the classifications of the National Tuberculosis Association as to the severity of appellant's tubercular condition (minimal, moderately advanced and far advanced), Dr. Ash stated that appellant "was at least moderately advanced" in January of 1954.

As to whether appellant had tuberculosis in January 1953, Dr. Ash testified: "I cannot answer that question yes or no. As I look at the film, I personally become suspicious of the possibility of tuberculosis . . . Looking at the entire picture from this date, January 9, '53, to this morning, sure, I think most everyone could be persuaded that he might very well have been carrying his infection at that time. But I cannot prove that." Dr. Ash also testified that if appellant had active tuberculosis in January 1953, it was a minimal case.

Dr. Epstein, an expert witness for appellant, testified that in his opinion appellant had active tuberculosis in January 1953. He further testified that the tuberculosis was of minimal severity both in January and October of 1953. In January of 1954 the disease was, in Dr. Epstein's opinion, "within the classification of moderately advanced diseases." This doctor testified that it was standard medical practice in 1953 in the Bay Area, when an X-ray film was reported as showing an infiltration in the mid-lung area, to make every effort to establish a diagnosis. To make this diagnosis requires a full history from the patient, "looking especially for a history of contacts with possible cases of tuberculosis." After this the diagnosis requires a complete physical examination with whatever laboratory work seems to be indicated.

Dr. Pfeiffer was at the time of the trial practicing medicine in Maine and there was testimony that it was "impossible" for him to come to California for the trial. The medical witnesses were agreed that Dr. Pfeiffer was possessed of the knowledge, training and skill of a competent and qualified internist specializing in cardiology in the area. There was also

testimony that the field of chest X-ray interpretation is not an exact science and it was agreed that no diagnosis of tuberculosis could be made on the basis of the January 9, 1953 X-ray alone without further tests. Testimony was given by experts for defendants that the X-ray of January 1953 would raise no suspicion of tuberculosis and that Dr. Pfeiffer did all that a prudent practitioner in the community would have done.

Appellant was hospitalized for 19 months, had lung surgery and surgery to correct a hernia caused by tuberculosis therapy. He was unable to work for 25 months and was still under medical care at the time of trial. There was evidence that necessity of medical care would continue indefinitely.

There was also testimony that if treatment had been instituted in January 1953, appellant's hospitalization would probably have been shorter and lung surgery would probably not have been required.

The jury returned a 9 to 3 verdict for respondents.

Appellant complains that certain instructions given by the court were prejudicially erroneous and after an examination of the record we are satisfied that this complaint is justified.

█ The court instructed that "the law presumes that Doctor Paul Pfeiffer acted in a careful manner, and was free from fault, and that said doctor was not, or is not responsible for the injuries sustained by plaintiff, if any, and this presumption follows the doctor through the entire case, unless and until overcome by evidence to the contrary."

It is ordinarily error to give such an instruction where evidence is produced by the defendant as to the circumstances of his conduct which is alleged to be negligent. (*Speck* v. *Sarver,* 20 Cal.2d 585, 587-588 [128 P.2d 16]; *Rozzen* v. *Blumenfeld,* 117 Cal.App.2d 285, 287 [255 P.2d 850]; *Wertheim* v. *Mears,* 104 Cal.App.2d 120 [231 P.2d 89].) Respondents argue that because of the testimony that it was impossible for Dr. Pfeiffer to appear as a witness the exception to this rule stated in such cases as *Scott* v. *Burke,* 39 Cal.2d 388, 394 [247 P.2d 313], should apply. The exception has so far only been applied where the person whose negligence is in question is either dead or unable to testify because of loss of memory. (*Gigliotti* v. *Nunes,* 45 Cal.2d 85, 93 [286 P.2d 809] and cases there cited.) Respondents quote the language of *Kellogg* v. *Gaynor,* 134 Cal.App.2d 288, 291 [285 P.2d 288]: "Where a party has died or *for some other reason is unable to testify* as to his acts which it is claimed were negligently per-

formed, there is a presumption that his acts were performed with a degree of skill and care which was commensurate with his duty, provided that the party claiming the benefit of the presumption has not introduced evidence of conduct wholly irreconcilable with the exercise of due care.'' (Emphasis ours.) The emphasized language, relied on by respondents, was dictum since the party whose conduct was in question in that case was in fact dead.

No court in this state has been called upon to decide whether a living party without loss of memory who has found it impossible to appear as a witness is entitled to the benefit of the presumption. We have grave doubt if the presumption should extend to such a case but we do not feel called upon to decide the question. The only testimony on the subject was given by a medical witness who testified that he had talked to Dr. Pfeiffer on the telephone about one week before and asked Dr. Pfeiffer to appear as a witness. He testified as follows: ''He said that whereas he had planned to come out to California, events had occurred which prevented him from coming. It was impossible for him to come. He did not enlarge on this since we immediately transferred our conversation to friendly and personal matters.''

This was no more than the conclusion of Dr. Pfeiffer that he found it impossible to attend the trial. What the events were which had occurred, which in Dr. Pfeiffer's opinion ''prevented'' his coming, were not stated. ██ We are satisfied that, even assuming that a party who found it impossible to testify by his being unable to attend the trial would be entitled to the benefit of the presumption, he must in any event prove the facts which prevented his attendance and not rest upon the statement of his naked and unsupported conclusion.

The defense of contributory negligence was not pleaded nor did respondents request any instruction on that defense. Nevertheless the trial judge announced after the close of the evidence that he intended to instruct the jury on contributory negligence and he did so. The only evidence relied upon here to establish contributory negligence is the notation ''3 mos.'' which defendants' witnesses (not the plaintiff) testified indicated that appellant was to return in three months, whereas he waited seven, his delay in keeping an appointment of one week in another instance and his voluntarily leaving the sanitarium for a few days.

██ Where a defense is neither raised by the pleadings nor

on the trial it is error to instruct the jury on it. (*Miller* v. *Peters,* 37 Cal.2d 89 [230 P.2d 803] ; *cf. Lein* v. *Parkin,* 49 Cal.2d 397 [318 P.2d 1].) Respondents attempt to invoke the rule that where contributory negligence is shown on the plaintiff's own case defendants are entitled to the benefit of such evidence, citing *Curtis* v. *Kastner,* 220 Cal. 185, 192 [30 P.2d 26] and *Gerfers* v. *San Diego Transit System,* 126 Cal. App.2d 733 [272 P.2d 930]. Appellant introduced the records which showed that he was one week late for one appointment and showed the notation "3 mos." He introduced these records for another legitimate purpose, to show the course of diagnosis and treatment, and it seems very doubtful that the rule of *Miller* v. *Peters, supra,* 37 Cal.2d 89, is not applicable.

Regardless of that fact the issue was whether Dr. Pfeiffer was negligent in not taking further diagnostic measures in view of the cloud on the lung shown by the first X-ray and the radiologist's note "It is suggested that the patient be evaluated for possible lung disease . . .," and there was no evidence that Dr. Pfeiffer's conduct in this respect was in any wise affected by appellant's delay in keeping later appointments or would have been any different if he had kept them. His absenting himself from the sanitarium for a few days after the tuberculosis was diagnosed obviously could be no defense to the antecedent negligence, if found, of the physician. Even where plaintiff's negligence is proved it must be a proximate cause of the injuries to be a defense. This case is, on its facts, on all fours with *Preston* v. *Hubbell,* 87 Cal.App.2d 53, 62 [196 P.2d 113], where it was held error to instruct the jury that they might consider plaintiff's delay in securing medical attention where there was no evidence that "more prompt treatment would have obviated the operation."

The trial court also gave the instruction on unavoidable accident since condemned in *Butigan* v. *Yellow Cab Co.,* 49 Cal. 2d 652 [320 P.2d 500]. There was no evidence justifying this instruction under the rule of the Butigan case.

The case was one depending upon the resolution of sharply conflicting expert testimony and the jury barely mustered the nine votes necessary to arrive at a verdict for defendants. We are satisfied that the cumulative effect of these instructions must on the facts of this case be held prejudicial.

Appellant was not entitled in this case, which necessarily depended on the testimony of experts, to an instruction that the jury could determine the question of negligence from

their common knowledge; nor was it error in this case, depending as it did entirely on the resolution of conflicting expert testimony, to refuse to give a res ipsa loquitur instruction.

Because of the errors herein noted the judgment is reversed.

Kaufman, P. J., and Draper, J., concurred.

A petition for a rehearing was denied September 10, 1958, and respondents' petition for a hearing by the Supreme Court was denied October 10, 1958.