[Civ. No. 20156.   First Dist. Div. Two.   Oct. 3, 1962.]

JIMMIE CHARLES SMITH, a Minor, etc., et al., Plaintiffs and Appellants, v. IRWIN M. SHANKMAN, Defendant and Respondent.

178

Walkup & Downing, Bruce Walkup, Gerald C. Sterns and William B. Boone for Plaintiffs and Appellants.

Taft, Hopkins, Newman & Robinson and Cranson L. Hopkins for Defendant and Respondent.

SHOEMAKER, J.—Plaintiffs appeal from a verdict and judgment for the defendant in an action to recover damages for wrongful death allegedly resulting from medical malpractice. The plaintiffs are the surviving husband and six children of the decedent, Elsie Mae Smith, who died on July 1, 1956, as the result of a ruptured tubal pregnancy.

The facts developed on this trial show that at 2 p. m. on the day preceding her death, Elsie Mae Smith, age 28, began to suffer from cramps in her lower abdomen and fainted upon attempting to walk to the bathroom. At about 3 p. m., her husband called his wife's regular doctor and was referred to his "covering doctor," the defendant, Irwin M. Shankman, M. D., and informed him of his wife's condition. The defendant, after suggesting that the wife be brought to the office, inquired if he could afford to pay for a house call. When Mr. Smith replied that he could, the defendant agreed to come and arrived at the house around 5 p. m. Mr. Smith testified that the doctor then pressed on the bottom of his wife's stomach in order to ascertain where her pain was

localized; used a stethoscope to listen at places where the pain was worst, but did not make a pelvic examination; further, that although the doctor did not inquire about his wife's menstruation, he volunteered the information that she had already had one period that month and was having a second period at that time. According to Mr. Smith, the doctor told him that this was not unusual. Dr. Shankman then gave Mrs. Smith a shot of penicillin and a shot of demerol to ease the pain. He also gave Mr. Smith his phone number in case he were needed.

By 8 o'clock that evening, Mrs. Smith's symptoms had become increasingly more severe. She was still suffering from cramps in the lower abdomen and again fainted in attempting to go to the bathroom. Although the bathroom was a distance of only 6 or 8 feet from her bed, she required aid to walk that distance. Shortly after 8 p.m., Mr. Smith attempted to reach the doctor by phone but was informed that he was not in. At 11 p. m., Mr. Smith called again and was told that the doctor had gone to a party. At about 12 p. m., Mr. Smith called the Vallejo General Hospital and asked if he could bring his wife in. He was told that he could not bring his wife to the hospital without a doctor's admission. At 2 a. m., Mrs. Smith again fainted while going to the bathroom, and Mr. Smith placed another call to the answering service. He was told that Dr. Shankman had not returned but that he would call Mr. Smith when he came in.

At approximately 5 a. m., Dr. Shankman called, and Mr. Smith informed him that his wife was still fainting and suffering from cramps, chills and fever. The doctor instructed Mr. Smith to go to the Vallejo General Hospital and pick up some pills. The pills prescribed were empirin and codeine to ease the pain, and nembutal to induce sleep. When Mr. Smith gave the pills to his wife, she immediately began vomiting, and Mr. Smith called the doctor and informed him of this symptom. The doctor advised him to give her aspirin.

By 7 o'clock in the morning, Mrs. Smith had fainted again and was having difficulty catching her breath. Mr. Smith called Dr. Shankman, and when he did not come to the house, got in touch with his brother and father. At 7:40 a. m., Mr. Smith again called Dr. Shankman and informed him that his wife had gotten worse—''She keeps a fainting.'' The doctor then told him not to call any more, that he would be out during the day.

After waiting until 9:30 a. m. for the doctor to arrive, Mr.

Smith, with the aid of his relatives, placed his wife in the car and drove her to Vallejo General Hospital. According to the testimony of a hospital nurse, Mrs. Smith appeared to be dead when she was placed on the hospital bed. The death certificate placed the time of death at 10:15 a. m., and listed the cause of death as a ruptured right tubal pregnancy, which was estimated to have set in 24 hours earlier. Dr. DeMay, the doctor who conducted the autopsy, testified that the decedent's peritoneal cavity contained 5 pints of blood. He stated that she had bled to death as a result of a ruptured Fallopian tube.

According to the testimony of Dr. Shankman, Mr. Smith never informed him, at the time of the initial phone call, that his wife was suffering from any symptoms other than chills and fever. He further testified that when he arrived at the house, Mrs. Smith complained of pain in the area of the tubes and uterus, that he found her to be feverish, but did not detect any sign of chills. He stated that he did not make a pelvic examination of Mrs. Smith because she was a fat woman, and this type of examination would not have revealed the existence of a tubal pregnancy. He also testified that Mrs. Smith did not inform him that she had had an additional menstrual period, but told him that she had commenced her period a few days earlier and was just finishing at that time. He stated that he took her blood pressure and found it to be within normal range. He diagnosed her condition as salpingitis, a pelvic inflammatory disease, and accordingly prescribed drugs which would combat the infection and reduce the pain.

Dr. Shankman further testified that when he talked to Mr. Smith at 5 a.m. the following morning, he was told that Mrs. Smith had not slept and that she was still having pain. He assumed that the salpingitis was getting a little worse and he accordingly prescribed nembutal to make her sleep. He stated that he received no further calls from Mr. Smith until 8 a. m., and, at that time, was told that Mrs. Smith kept fainting when she got up to go to the bathroom. He considered it nothing unusual, since people faint even when approached by a needle. He stated that he had never been informed of this symptom until that time, but that he did not consider it inconsistent with his earlier diagnosis of salpingitis. He therefore instructed Mr. Smith to keep his wife in bed and advised him that he would come out to see her later.

In addition to the evidence above summarized, plaintiffs' expert witness testified that in his opinion, standard medical care had not been followed by the defendant. Defendant's expert testified to the contrary.

Upon this evidence, verdict and judgment were for the defendant.

Appellants' primary contention is based upon the bailiff's conduct. The jury's deliberations commenced at 2:10 in the afternoon. Four hours later the jury had not yet arrived at a verdict, and the court thereupon directed the bailiff to take them to dinner. The jury returned to continue its deliberations at 7:30 p. m. Subsequently, at approximately 7:45 or 8 p. m., in response to a knock on the door of the juryroom, the bailiff opened the door and the jury foreman informed him that the jury wanted the transcript of Dr. Shankman's testimony. The bailiff replied that the jury could not have that transcript. He then closed and locked the door.

Thereafter, at 8:45 p. m., appellants counsel, Mr. Walkup, returned from dinner and was informed by his client of the jury's request. Whereupon, Mr. Walkup, in the presence of respondent's counsel, told the judge in chambers what he had learned and asked that the bailiff be questioned concerning the matter. The judge called the bailiff into chambers, found the incident had occurred, and then instructed the bailiff, upon Walkup's request, to bring the jury into open court. The bailiff went to the juryroom and returned, reporting that the jury desired a few more minutes. Before the court could take further action, the bailiff reported that the jury had reached a verdict.

At 9:05 p. m., the jury returned to court and announced that they had arrived at a verdict. The judge then asked the foreman if the jury desired any instructions or the reading of any testimony at that time. The foreman replied that they did not. Upon being asked by Mr. Walkup whether they had previously asked the bailiff for a reading of certain testimony, the foreman replied that they had requested a transcript of Dr. Shankman's testimony, but that the bailiff had told them that this could not be done. In response to questions put by the court and counsel for respondent, the foreman stated that the jury had arrived at a verdict without the necessity of having the desired testimony read to them. The verdict, being ten to two in favor of respondent, was then read by the clerk.

In addition to the evidence above summarized, appellants, in support of their motion for a new trial, produced the affidavits of two members of the jury. Both affidavits were to the effect that the jurors were extremely vague in their recollections of the testimony of Dr. Shankman and Mr. Smith concerning the three telephone calls purportedly made on the morning of Mrs. Smith's death. Since the jurors were about evenly divided and felt a definite need for clarification of these points, their foreman asked the bailiff for a "transcript" of Dr. Shankman's testimony. When this request was denied, the jurors reached a verdict by attempting to recall the relevant testimony "as best we could."

Appellants now contend that the bailiff's conduct deprived them of a fair trial, and that such error must be deemed so prejudicial as to require a reversal of the judgment.

Code of Civil Procedure, section 613, provides that when a case is finally submitted to the jury, they may decide in court or retire for deliberation. "Unless by order of the Court, the officer having them under his charge must not suffer any communication to be made to them, or make any himself, except to ask them if they or three-fourths of them are agreed upon a verdict. . . ." Pursuant to Code of Civil Procedure, section 614, if, after they have retired, the jurors disagree as to any part of the testimony, or desire to be informed of any point of law, they may require the officer to conduct them into court. "Upon their being brought into Court, the information required must be given in the presence of, or after notice to, the parties or counsel."

The cases construing these sections have consistently required a strict compliance with the rules therein set forth. In *Halada* v. *Venice Lake Park, Inc.* (1955) 132 Cal..App.2d 788 [283 P.2d 42], the jury, after deliberating for part of two days, requested a further reading of certain evidence, and the trial court, without consulting counsel, communicated his refusal of this request through the bailiff. On appeal, the judgment was reversed, with the court stating: "The incident was by no means trivial, nor, was it unimportant. Counsel, who were present, were entitled to be informed as to the jury's request. Whether the outcome or the verdict would have been any different is beside the issue. The verdict was 9 to 3. In the circumstances, the action of the trial judge must be held, as a matter of law, to have been prejudicial." (Pp. 789-790.) Similarly, in *Davis* v. *Erickson* (1960) 53 Cal.2d 860 [3 Cal.Rptr. 567, 350 P.2d 535], the jury, after deliberating

for some time, asked the court to reread the instructions on negligence and assumption of risk. The court inadvertently failed to read all of the instructions pertaining to these subjects, and, upon being informed of its error, refused to recall the jury. On appeal, court's action was held to constitute prejudicial error. The court said: "We can only reasonably assume that the jury's request for a rereading of all of the instructions on negligence was properly motivated either by a failure of the jury to clearly recollect the full import of such instructions or by a disagreement among the jurors as to the instructions which had been actually given." (P. 864.) In *Nelson* v. *Southern Pacific Co.* (1937) 8 Cal.2d 648 [67 P.2d 682], the court communicated with the jury after their retirement by sending them a message through the bailiff without the presence of counsel. The appellate court pointed out that such conduct was clearly not in accord with Code of Civil Procedure, section 614, which requires that the jurors be brought into court and given the information requested in the presence of counsel. "Any other method of communication is held to go to the substance of the right of trial by jury and because of its nature is deemed to be prejudicial except in very exceptional circumstances." (P. 655.)

In *James* v. *Key System Transit Lines* (1954) 125 Cal. App.2d 278 [270 P.2d 116], the court shed further light on the "exceptional circumstances" which would render an improper communication with the jury nonprejudicial. In that case, the jury, after deliberating for almost an hour, asked to see a deposition of which only certain portions had been read into evidence. Although counsel for the defendant requested that the court instruct the jury that they could have a rereading of any parts which had already been read at the trial, the court refused to so inform them and merely denied their request to see the deposition. On appeal from the resulting judgment for the plaintiff, the court held that the lower court, at the very least, ought to have informed the jury that it had a right to have at least a portion of the deposition read. "But to refuse to inform it of its rights in this respect, when the judge was, in effect, informed that the jury was in difficulty in some way about the deposition, clearly prevented a fair trial, *unless the matters in the deposition were inconsequential.*" (P. 283; emphasis added.) The court accordingly concluded that there had been no miscarriage of justice because nothing in the deposition contradicted the plaintiff's testimony or affected his credibility in any way.

When the facts in the instant case are viewed in the light of these authorities, there can be no doubt that the conduct of the bailiff constituted error. Pursuant to Code of Civil Procedure, section 613, the bailiff was specifically prohibited from communicating with the jurors in any manner other than to ask them if they had agreed upon a verdict. By informing them of his own understanding of the rules governing what evidence might be brought into the juryroom, he clearly overstepped the bounds of his authority and infringed upon the right of the parties to have their case tried by a jury free from outside influence. Although it is true, as respondent points out, that the bailiff was technically correct in instructing the jurors that the written transcript itself could not be given to them, it does not follow that his misconduct was of no consequence. "While the jury's action did not constitute in so many words a request for a reading of some portion of the transcript, such action can reasonably be interpreted only as such a request. . . ." (*James* v. *Key System Transit Lines, supra,* at p. 283.) Had the bailiff properly deferred action on the jury's request until the trial judge had returned from dinner, the jury could then have been brought into open court, pursuant to Code of Civil Procedure, section 614, and the judge could have inquired whether they desired to have portions of the relevant testimony reread. As a result of the bailiff's failure to follow this procedure, the jury's request for the transcript was denied in such a manner as to indicate that there was no alternative method by which they could review testimony which they obviously considered important.

Appellants assert that the affidavits of the two jurors concerning the divided state of the jury and their inability to recall significant portions of the testimony may properly be considered by this court. There is little merit to this argument. The California courts have consistently held that affidavits of jurors may be used to impeach their verdict in two instances only—to show that the verdict was reached by lot or by chance, Code of Civil Procedure, section 657, subdivision 2; and to show that the bias or disqualification of a juror was concealed by false answer on *voir dire.* (*Kollert* v. *Cundiff* (1958) 50 Cal.2d 768, 773-774 [329 P.2d 897] ; *Watson* v. *Los Angeles Transit Lines* (1958) 157 Cal.App.2d 112, 116 [320 P.2d 890].) The affidavits in the case at bar clearly fall within neither category. Appellants contend, however, that this court ought to follow the reasoning of *Wilkins* v. *Abbey* (1938) 168 Misc. 416 [5 N.Y.S.2d 826], where the court held

that the use of affidavits of jurors to show misconduct on the part of *third parties* did not fall within the prohibition of the rule that jurors will not be heard to impeach their verdict. This precise argument was rejected by the California Supreme Court in *People* v. *Gidney* (1937) 10 Cal.2d 138, 146-147 [73 P.2d 1186], where the court stated that "the evil, if any, [in the California rule] is established in this state by the legislative authority, and can only be cured by amendment."

In any event, even if this state were in accord with the New York rule, the affidavits in the present case were completely unnecessary to establish the misconduct of the bailiff, whose actions were already attested to by himself and by Mr. Smith. Under such circumstances, the jurors' affidavits would be purely cumulative on this issue, and, if used to show the state of their deliberations and their inability to recollect testimony, would clearly serve no other purpose than impeachment of their own verdict.

In view of the California law, we must determine whether the evidence, exclusive of the jurors' affidavits, is sufficient to show that appellants were in all probability prejudiced by the acts of the bailiff or whether this case is one in which there are "exceptional circumstances" rendering the error harmless. In resolving this question, we proceed on the reasonable assumption that the jury, in making its request for the transcript, felt a definite need to review certain portions of Dr. Shankman's testimony. (See *Davis* v. *Erickson, supra,* at p. 864.) Had the court at that time offered to have the relevant testimony reread to the jury, it is entirely possible, as a practical matter, that its verdict might have been affected. The fact remains, however, that the trial judge, immediately upon being informed of the bailiff's conduct in denying the jury's request, ordered the jurors brought into court, and, before receiving their verdict, asked if they desired to have any portions of the transcript read to them. The foreman replied that they had been able to reach a verdict without the need to review the testimony they had earlier requested. In *People* v. *Warren* (1900) 130 Cal. 678 [63 P. 87], the jury had asked to have reread certain testimony which the reporter estimated would take approximately two hours. Since it was then late in the day, the judge announced that he would adjourn court until 9 a. m. the following day and have the testimony read at that time. Shortly before 9 a. m., the jury announced that it had reached a verdict. On appeal from the resulting judgment, the court held that it was entirely proper to receive the verdict without requiring a rereading of the testimony earlier re-

quested. ▮▮ In the case at bar, the jury similarly stated that it no longer desired to review any testimony since it had been able to reach a verdict without it. In view of this statement, the bailiff's misconduct alone cannot be deemed to have resulted in prejudice sufficient to compel a reversal.

▮▮▮ Appellants also direct this court's attention, however, to certain errors in the instructions given by the trial court. They first complain of the giving of instructions that: "Physicians and surgeons are not bound to use any particular method of treatment, and if among physicians and surgeons of ordinary skill and learning more than one method of treatment is recognized, it is not negligence for the defendants to adopt either of such methods; and the fact that some other method of treatment existed or some other physician or surgeon might or would have used or advised the other different method, does not establish negligence on the part of the defendant. . . .

"Where there is more than one recognized method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all practitioners of good standing, it is not negligence for a physician and surgeon if, in exercising his best judgment, he selects one of the approved methods, which later turns to be a wrong selection, or one not favored by certain other practitioners." It is appellants' position that both of the above quoted instructions were without any basis in the evidence and were therefore calculated to mislead the jury and to divert its attention from the actual issues before it. Appellants are clearly correct in this contention. The sole issue presented by the facts in the case at bar was whether Dr. Shankman's failure to diagnose a tubal pregnancy was the result of negligence on his part. A review of the entire record discloses no evidence whatever that the treatment actually given by the doctor was a proper or recognized method of treating a tubal pregnancy. Dr. Shankman himself testified that standard medical practice would require that a patient with a ruptured tubal pregnancy should immediately be hospitalized for surgery. In response to a question as to whether he had given Mrs. Smith any treatment which would aid in curing a ruptured tubal pregnancy, the doctor replied, "I did not." When asked whether the treatment he had given would in any way help to prevent a tubal pregnancy from rupturing, he replied, "None whatsoever." Under such circumstances, it cannot be doubted that the instructions complained of were utterly unsupported by the evidence and were calculated to divert the jurors from the real issues before them. (*Maertins*

v. *Kaiser Foundations Hospitals* (1958) 162 Cal.App.2d 661, 666-667 [328 P.2d 494, 75 A.L.R.2d 807]; *Pierce* v. *Black* (1955) 131 Cal.App.2d 521, 529 [280 P.2d 913]; *Balthrop* v. *Atchison, T. & S. F. Ry. Co.* (1959) 167 Cal.App.2d 437, 445-446 [334 P.2d 1041].) Neither can it be assumed that the giving of these instructions had no substantial effect on the outcome of the trial.

Appellants also contend that the instructions given overly emphasized the defense side of the case. Appellants point out that, in addition to the two instructions above set forth, the jury was instructed that: the difficulties and uncertainties in the practice of medicine are such that no practitioner can guarantee results; a physician is not responsible for unexpected occurrences or an unsuccessful result; neither a failure to cure nor a bad result from treatment is evidence of negligence; mere mistakes in judgment do not constitute malpractice; the law does not require of a physician infallible judgment or perfection, nor does it condemn him because his efforts prove unsuccessful; difficulties and uncertainties in the practice of medicine, and unpredictable variations in response to treatment are such that no practitioner can guarantee results; a physician may err in judgment or be unsuccessful in treatment without being negligent. Although none of these instructions, standing alone, would appear to be prejudicially erroneous, it may well be doubted whether such an extensive array of defense-oriented axioms was necessary to properly apprise the jury of the relevant legal principles. To the contrary, the overall effect of these instructions, which are to a large degree repetitive, in our appraisal thereof tended to clothe the doctor in a cloak of legal immunity in the eyes of the jury. At the very least, it may be said that the defense aspects of the case were given undue prominence. Such a practice is not to be commended (*Taha* v. *Finegold* (1947) 81 Cal.App.2d 536, 544 [184 P.2d 533]), and undoubtedly resulted in substantial detriment to appellants. (*Clark* v. *State of California* (1950) 99 Cal.App.2d 616, 624 [222 P.2d 300].)

The cumulative effect of the errors above discussed clearly compels a reversal of the judgment and it becomes unnecessary to discuss the other contentions raised by appellants.

Judgment reversed.

Kaufman, P. J., and Agee, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 28, 1962.