[S. F. No. 4533. In Bank.—December 21, 1908.]

GERMAN SAVINGS AND LOAN SOCIETY, Appellant, v. W. S. McLELLAN, Respondent.

SPECIFIC PERFORMANCE—CONTRACT FOR SALE OF LAND—RESERVATION OF SPRING.—There can be no contract unless the minds of the parties have met and mutually agreed. Equity requires as a condition of

specific performance of a contract for the sale of land a clear, mutual understanding and a positive assent on both sides as to the terms of the contract. In the present case it is held, upon a review of the evidence, that there was no mutual understanding as to the identity of a spring to be reserved to the vendor under the contract, and that such reservation was a most material part of the proposed contract.

APPEAL from a judgment of the Superior Court of Contra Costa County and from an order refusing a new trial. William S. Wells, Judge.

The facts are stated in the opinion of the court.

Goodfellow & Eells, for Appellant.

W. S. McLellan, *in pro. per.,* for Respondent.

ANGELLOTTI, J.—This is an action commenced March 7, 1899, to quiet plaintiff's title to a tract of land in Contra Costa County, containing some 261.33 acres. Plaintiff is the owner thereof except in so far as its title is affected by an alleged parol contract of sale set up in defendant's cross-complaint, under which it is alleged, he entered into and remains in possession, and as to which he seeks specific performance. The issues made by the cross-complaint and plaintiff's answer were tried by the court with an advisory jury, findings of the jury in favor of the defendant were adopted by the court, and a decree of specific performance was given on October 3, 1899, as to the land "save and except the small pipe spring further from the house shall be retained to plaintiff with privilege of running the water through pipes over the land, conveyed to tanks prepared to receive such water and to carry such water from said tanks." On October 2, 1905, an order was made denying a motion for a new trial. This is an appeal by plaintiff from the judgment and from the order denying the motion for new trial.

For the purposes of this appeal, it is necessary to consider but one point. The property in question was a part of a tract of land owned by plaintiff, known as the Hemme Ranch, which had been subdivided into smaller subdivisions for purposes of sale, and a map thereof showing such subdivisions, numbered as lots, had been made. Lots 32, 33, 34, and 35, with an area

of 73.70 acres, comprised what is called the orchard tract, lot 30 adjoining this on the northeast contained 33⅓ acres of farming land, and lot 28 southwest, west and northwest of the orchard, contained 254.06 acres of hill and pasture land. There was on the orchard tract and about one hundred yards from the house thereon a valuable spring, known as the large or main spring, which was connected by pipes with tanks owned by plaintiff situated on the Hemme Ranch, and the water of this spring, which was the main supply of such tanks, was used by various persons holding under plaintiff, including any occupant of the orchard tract. The testimony indicated that there was also a small undeveloped spring on this tract, some two hundred yards or more from the house, but there was some evidence on the part of defendant that there was in fact no real spring there, and the jury in response to the question "How many springs were there on the property in question near the house?" answered "One." In the southeasterly corner of lot 28, in accordance with defendant's testimony, about one fourth of a mile from the house, there was a developed spring, very much smaller than the one in the orchard, but sufficient, defendant testified, "for farming purposes for one or two families." There was some slight testimony which indicates that this spring was also connected by pipes with the tanks. Defendant first examined this property in the early part of October, 1899, being shown it by Mr. Harrison, plaintiff's agent in charge, who was without any authority, so far as appears, to make any definite arrangements. Whatever definite arrangements were made were had with Mr. Tourny, secretary of plaintiff, at plaintiff's bank in San Francisco. After some preliminary meetings Mr. Tourny and defendant apparently reached an understanding on October 20, 1899, that defendant was to purchase, for a consideration as to which there is some dispute and which is not material on the point we are discussing, the orchard tract, lot 30 (the farming land), and the portion of lot 28 lying south of a line then roughly drawn on the map by them across said lot, which would include the spring thereon. It is undisputed that it was understood that plaintiff was to reserve one spring, the tanks, and the right to conduct water to the tanks through the pipes on the land to be sold. The question here is what spring was so intended to be reserved. Defendant then gave to Mr. Tourny

his wife's check for $440.89 on account of the two thousand dollars to be paid on delivery of the deed, the remainder of the purchase price to be secured by mortgage. A survey was to be made to obtain the description of the portion of lot 28 to be conveyed, and pending such survey and preparation of the necessary deed and mortgage, defendant went into possession of the premises on November 13th. He expended thereon something in the neighborhood of one thousand dollars in farming operations and in improving the house. When it came to the matter of executing the papers in December, 1899, it was discovered that there was a misunderstanding as to which spring was to be reserved, and negotiations were at once broken off, and this litigation immediately followed. The check given by defendant has never been cashed, and plaintiff offered to return it both in December, 1899, and on the trial. No resolution was ever adopted by plaintiff's board of directors authorizing any sale of any property to defendant until the succeeding February. This February resolution was excluded from evidence on objection of defendant, but Mr. Tourny testified that it correctly stated the terms of the agreement between himself and defendant, which means, of course, that it stated them in accord with his version of those terms, which is entirely at variance with defendant's statement as to the terms.

The jury specifically found that plaintiff as part of the sale referred to in the cross-complaint, sold to defendant "the large spring nearest the dwelling house," that Tourny in making his memorandum hereinafter described referred to such large spring, that Tourny was not bargaining to give defendant the small spring, and that at the time the check was given the minds of both defendant and Tourny were agreed upon the small spring as the one to be reserved. While the evidence may have been sufficient to support a finding that defendant understood that he was to have the spring nearest to the house, which was the main or large spring, we can find nothing therein warranting a conclusion that Tourny, representing the plaintiff, was negotiating upon any other theory than that the plaintiff was to reserve that spring from the transfer, and that the most that plaintiff was willing to concede in regard to it was that defendant might use water therefrom in common with other persons occupying land purchased from or held under plaintiff.

The evidence establishes very clearly that when the matter of the springs was first talked of, the representatives of plaintiff desired to retain all the springs, allowing defendant simply to use water therefrom in common with other purchasers and occupants, but that defendant objected to such an arrangement, and that finally it was understood that he should take all but one spring. When the arrangement was finally made between Tourny and defendant, on October 20th, Tourny had not personally seen the property, and his knowledge of the location of the springs was obtained entirely from Harrison over the telephone. Tourny testified that Harrison told him over the telephone about the springs, that there were two, and that the larger one where the main supply of water came from would have to be retained by the bank, but that the defendant might use water therefrom; that he received this information in the presence of defendant, making a memorandum of the terms of the agreement as he did so, and informing defendant as to the message; that he also said to defendant "I would give you this spring if I could, but Mr. Harrison tells me it is needed here for the ranch, we can't do without it; we must have this water." In this written memorandum of the terms of the agreement then made by Tourny, which was introduced in evidence by defendant, appears the following: "Agt. for spring, small spring near house to go to purchaser other spring to be retained & privilege given to remove tanks to suitable elevation." There is really nothing substantial in defendant's testimony, which was the only other evidence as to the arrangement on this matter between Tourny and defendant, that conflicts with this testimony of Tourny as to his understanding in regard to which spring was to be reserved. It is true that on his direct examination defendant testified that Tourny had said to him "we will sell you the spring next to the house." But his cross-examination demonstrated that whatever was said by Tourny relative to the spring near or nearest to the house was based upon the assumption known to defendant that it was not the largest or main spring, and that it was the desire and intention of plaintiff not to convey the main spring. In his deposition read on such cross-examination and acknowledged by him to be correct, he said: "He told me that he would sell me the spring nearest the house; that they reserved the spring on the hill for themselves; and he said the

spring on the hill was the largest spring, and that they reserved that for themselves. . . . I told him I wanted the largest spring. I thought I was entitled to it buying the land, and he said no, that Harrison said that they must keep the largest spring." In no place did he deny that Tourny consistently insisted that the largest spring—the main spring—was to be reserved, and the defendant was to have the small spring. The following is an example of his cross-examination:

"Q. Did he tell you also that you were to have the smaller of the two springs, the smallest spring of the two?

"A. Yes sir.

"Q. Now you are claiming the bigger one, ain't you?

"A. I know nothing about the bigger one.

"Q. I say the one you are claiming now is the bigger one?

"A. I believe it is.

"Q. You are claiming now what he didn't intend to give you?

"A. I am claiming what he sold me.

"Q. You are not claiming what he intended to sell you?

"A. I don't know what he intended to sell me. I know what I believe he intended to sell me."

On redirect examination he said: "He didn't say the smaller spring of the two. He said I would have that spring which was the smaller spring, the one nearest the house was the one he was selling me." Whatever may have been defendant's idea as to which of the two springs was the larger, the one in the orchard or the one on lot 28, we can see no warrant in the evidence as to what transpired between the parties for the conclusion that Tourny, acting for the plaintiff, was willing to part with what was in fact the larger spring, whether it was the spring nearest the house or not, or for any assumption on the part of defendant from what Tourny said that he was to have the spring nearer the house, if it was, in fact, the larger spring. He was informed in the plainest and most unequivocal terms that the largest spring must be reserved. The words "small" and "large" as used in describing the springs cannot, under the circumstances, be entirely disregarded. Therefore, assuming that defendant believed that he was bargaining for the spring nearest the house, it is manifest from what was said that Tourny intended to reserve what was in fact the larger spring, and that the minds of the two did not meet as to the particular spring to be reserved.

There can be no contract unless the minds of the parties have met and mutually agreed. Equity requires as a condition of specific performance a clear mutual understanding and a positive assent on both sides as to the terms of the contract. (See 26 Am. & Eng. Ency. of Law, p. 21; *Cortelyou's Appeal,* 102 Pa. St. 576; *Coles* v. *Bowne,* 10 Paige (N. Y.) 526; *Wristen* v. *Bowles,* 82 Cal. 84, [22 Pac. 1136].) The evidence of the oral negotiations between Tourny and defendant does not furnish support for a conclusion that there was any such mutual understanding in the matter of the spring to be reserved, and this was a most material part of their proposed contract.

Our views upon the question thus discussed render it unnecessary to consider any of the many other objections made by plaintiff to the specific performance of this alleged contract.

The judgment and order denying a new trial are reversed.

Shaw, J., Sloss, J., Lorigan, J., Henshaw, J., and Melvin, J., concurred.