[Civ. No. 18583. First Dist., Div. Two. Apr. 29, 1960.]

NELL HENDRICKS, Appellant, v. SEIBERT L. SEFTON, Respondent.

Vernon W. Humber and Michael L. Haun for Appellant.

A. Brooks Berlin for Respondent.

PAULSEN, J. pro tem.*—On the 20th of January, 1956, appellant herein was injured in an automobile accident. She employed respondent, an attorney at law, to represent her in an attempt to recover compensation for the damages suffered. On the 5th of April, 1956, appellant and respondent entered into an attorney's retainer agreement. By it appellant empowered respondent to effect a compromise or to bring suit, and agreed to pay him one-third of the amount recovered, respondent to advance necessary disbursements and costs. Respondent was also given the right to a lien for the amount due him under the contract.

Thereafter respondent performed services in connection with his employment, instituted suit on behalf of appellant, and was attempting to have the case set for trial at an early date when, on October 8, 1956, appellant wrote him a letter terminating his employment. She then employed other attorneys to handle her case.

Respondent asserted the right to the full compensation specified in the agreement and to a lien therefor. Appellant offered to pay on the basis of the reasonable value of the work already performed. This was refused. Thereupon appellant filed the present action for declaratory relief asking that the agreement be declared null and void. She charged, in substance, that the agreement was not made voluntarily, and was signed, without her having read it, as a result of respondent's misrepresentations and undue influence. She alleged that respondent knew she would not sign without the approval of her friend, a Mr. Kriha; that respondent represented that such approval had been given when in fact it had not; that she had discharged respondent for reasons which will be discussed later.

The trial court rendered judgment in favor of respondent and this appeal is from that judgment. Seven grounds of appeal are listed but basically all are claims that the evidence was insufficient to support the findings. Appellant argues that whatever respondent is entitled to recover should not include a percentage of anything received because of special damages.

The evidence was conflicting and appellant's argument is of the kind usually and more appropriately addressed to the trial court. It seems to be necessary once more to state the rule of law applicable on appeal. ██ We quote from

*Assigned by Chairman of Judicial Council.

*Newman* v. *Albert,* 170 Cal.App.2d 678, at page 683 [339 P.2d 588] :

''The rule as to our province, where, as here, the sufficiency of the evidence to support the trial court's findings is questioned, is stated in *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689], as follows:

'' ' ''. . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. ▆▆ When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.'' (Italics added.) (*Crawford* v. *Southern Pacific Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183].) The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict.'

▆▆ ''Questions as to the credibility of a witness and the determination of conflicts and inconsistencies in his testimony are for the trial judge. (*Dillard* v. *McKnight,* 34 Cal.2d 209, 223 [209 P.2d 387, 11 A.L.R.2d 835].) ''

Following the foregoing rule, there is evidence which shows that respondent had known appellant for four or five years and had known her friend, Mr. Kriha, even longer and that they were all personal friends; that the first time he talked to Mr. Kriha about appellant's case was in January, 1956, the Monday following her accident, at which time Mr. Kriha asked respondent whether he handled personal injury cases and if so on what basis, to which respondent replied that he did handle such cases and that the fee would be one-third; that this was the usual going rate. Nothing was said at the time about anything coming off the gross recovery before the attorney's fee of one-third was computed. Respondent testified that it was his impression of that meeting that Mr. Kriha was gathering general information about what an attorney would charge; that he did not understand at that time that he had the case. Mr. Kriha told respondent that he would speak to appellant about respondent's representing her.

About a week or two later respondent again saw Mr. Kriha who inquired further about the fee and how the one-third

was computed. Respondent told him that the attorney advanced the costs and when the case was over the attorney was reimbursed for the amount so advanced and the balance was divided "one-third, two-thirds." Mr. Kriha asked about the expenses and costs that appellant would put up, such as doctor and hospital bills, and was told by respondent that such would be part of the gross recovery of which the attorney would get one-third. Mr. Kriha asked respondent if he would take the case on the basis of payment to appellant of her medical expenses and wage loss out of the gross recovery before the computation of attorney's fees and was told by respondent that he would not. After this explanation and discussion Mr. Kriha said: "Well, Nell wants you to go ahead with it."

Appellant came home from the hospital on Washington's birthday and respondent went out to her home to see her the following Saturday. At that time respondent asked appellant whether or not she wanted him to represent her, as he had had no direct word from her. They discussed the arrangement and respondent told her what he had told Mr. Kriha before, that the fee would be one-third of the gross; that he made it very clear to her that her medical expenses and loss of wages would not come off the top, that he never handled a case that way and didn't intend to handle her case that way. After discussing the fee arrangement appellant told respondent she wanted him to go ahead.

Respondent then went back to his office and the following day he prepared a claim against the city—a defendant in the personal injury case—which he took out to appellant's home on March 1, 1956, for her to sign. The claim was filed and later denied. Appellant was later notified of the denial and told that it would be necessary to file a complaint. A complaint was prepared for her signature and at the same time the attorney's retainer agreement was also prepared. Respondent asked Mr. Gartland, his partner, to drop by appellant's home and have her sign them. Mr. Gartland 'phoned and got the reply that she would prefer to have respondent bring the papers out.

Respondent 'phoned appellant the next day and told her he would be out that evening, and that evening he and his wife went to appellant's home where they found appellant, Mr. Kriha, and an out-of-town guest. Appellant, respondent and Mr. Kriha went into the kitchen while the guest and respondent's wife stayed in the living room. Respondent told appellant that he had the complaint and the retainer contract and that in view of the fact she had guests she should

read over the complaint and contract, which were left with her, and that respondent would be over the following morning on his way to work to pick them up; that she should not sign them until the next morning as respondent wanted them signed in his presence, since he was a notary. Mr. Kriha was mixing drinks, was in and out of the kitchen and respondent did not know how much of the conversation Mr. Kriha heard, or whether he was paying any particular attention.

The next morning respondent 'phoned appellant and asked her if everything was all right and whether he should stop by, and she said "Yes." Then respondent went to appellant's home where she signed the complaint and agreement in his presence. A copy of the agreement was left with her.

Respondent filed the complaint the following day, and on May 25th, as soon as the case was at issue he filed a memorandum to set. Arrangements were made to take depositions in June, but the date was postponed because of the unavailability of one of the witnesses. In the meantime respondent had obtained a copy of the police report, had checked it out and had checked the emergency hospital report. He had also talked to appellant's doctor.

Respondent denied the accusations made by appellant and testified that he never at any time misrepresented the facts or the law or exerted any pressure on appellant to obtain her signature.

Appellant argues that the evidence is insufficient to overcome the presumption of undue influence that arises from the relationship of attorney and client. Where the relationship exists, the attorney has the burden of showing that the transaction between him and his client is fair, and that the client was fully advised of his rights. (*Bonifacio* v. *Stuart,* 52 Cal.App. 487 [199 P. 69].) If the attorney has obtained an advantage by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind, the contract does not bind the client. (Civ. Code, §§ 2228, 2235.) Whether or not the relationship already existed at the time the agreement was signed is a question of law, but where there is a conflict in the evidence, the factual basis must be determined by the trial court, and it is for the trial court to evaluate the evidence. (*Meehan* v. *Hopps,* 144 Cal.App.2d 284 [301 P.2d 10].) Appellant appears to take the position that merely because the agreement provided for a one-third recovery and that respondent did not complete the litigation the contract

was unfair and inequitable. The courts have repeatedly taken notice of the fact that such contracts are of "a very common variety" and are not necessarily unfair because they contain such terms. (*Jones* v. *Martin,* 41 Cal.2d 23 [256 P.2d 905]; *Zurich Gen. Acc. & Liab. Ins. Co., Ltd.* v. *Kinsler,* 12 Cal.2d 98 [81 P.2d 913]; *Jones* v. *Brown,* 84 Cal.App.2d 390 [190 P.2d 956]; *Eaton* v. *Thieme,* 15 Cal.App.2d 458 [59 P.2d 638].) Contracts calling for a greater percentage have been upheld. (See *Houge* v. *Ford,* 44 Cal.2d 706 [285 P.2d 257]; *Jackson* v. *Campbell,* 215 Cal. 103 [8 P.2d 845]; *Estate of Raphael,* 103 Cal.App.2d 792 [230 P.2d 436].)

■ It is impossible to tell from the findings whether the trial judge considered that no relationship of attorney and client existed at the time the agreement was signed or whether he felt that the agreement was fair and equitable in any event. The question whether or not the relationship existed is not important for there was no evidence that the slightest misrepresentation, concealment, threat, or adverse pressure of any kind was exerted to secure the signing of the agreement. Appellant was given every opportunity to read it, to ask questions, to consult with her friend and to understand it fully. The evidence was clearly sufficient to support the finding.

Appellant contends that she was justified in discharging respondent and therefore respondent was not entitled to collect the full fee. ■■ A client may terminate the contractual relationship of attorney and client without giving a reason therefor. (*Echlin* v. *Superior Court,* 13 Cal.2d 368 [90 P.2d 63, 124 A.L.R. 719]; *Scott* v. *Superior Court,* 205 Cal. 525 [271 P. 906]; *Gage* v. *Atwater,* 136 Cal. 170 [68 P. 581].)

■ Where an attorney is discharged for sufficient cause, he is entitled to no more than the reasonable value of the services performed before his discharge. (*Salopek* v. *Schoemann,* 20 Cal.2d 150 [124 P.2d 21].) On the other hand where an attorney is discharged without cause, he is entitled to recover the full amount provided for in his contract. (*Zurich Gen. Acc. & Liab. Ins. Co., Ltd.* v. *Kinsler, supra,* 12 Cal.2d 98; *Jones* v. *Martin, supra,* 41 Cal.2d 23; *Estate of Raphael, supra,* 103 Cal.App.2d 792.)

"With respect to a determination of whether the discharge of an attorney has been 'without cause,' it is obvious that no precise act or fixed line of conduct on the part of the attorney may be accurately defined or specified as furnishing a sufficient reason for an application of the rule against him. Mani-

festly, 'cause' which in legal contemplation would justify the cancellation of a contingent contract for compensation on account of legal services thereafter to be rendered, necessarily would have to depend upon the particular circumstances that were present in each case. In that regard, it is not improbable that its determination very properly might relate to 'time, place and persons.' A single act which had occurred at a certain time, at a designated place, and in the presence of specified persons, in all propriety might possibly be termed entirely out of keeping with the orderly and dignified conduct by which an attorney should demean himself, under different circumstances might present an entirely different aspect. It thus may become apparent that the question whether 'cause' for the abrogation of such a contract exists or has existed may be one of fact; and it also should be clear that in connection with the facts which may be established, a legal question as to their sufficiency is more than likely to ensue. That is to say, that a conclusion with reference to the ultimate question of fact necessarily must rest upon substantial and sound reasons therefor, and not be made to depend upon mere whim, caprice, or arbitrary judgment. It is apparent that to judicially declare, without limitation, that for 'cause' a covenant of contingent compensation to be paid to an attorney may be broken with impunity and without consequent pecuniary liability, in itself is so broad, elastic and so lacking in desirable precision, that if unrestrained and unrestricted would be but to open the door to the perpetration of fraud. The 'cause' must be not only 'good,' but it also must be legally sufficient. . . .''

(*Zurich Gen. Acc. & Liab. Ins. Co., Ltd.* v. *Kinsler, supra,* at pp. 101-102.)

Turning now to the evidence offered by appellant to show just cause, it appears that after writing the letter terminating the employment, she and Mr. Kriha went to respondent's office. Respondent testified that he told them he felt his employment was being wrongfully terminated; that appellant replied that she felt he ''was a very good attorney''; that she had no complaint about his ability at all; that there is ''outside influence,'' and further that she stated there were ''too many people at her,'' and she ''just had to change.''

The evidence was sufficient to support the finding that there was no sufficient cause for terminating the agreement.

The judgment is affirmed.

Kaufman, P. J., and Draper, J., concurred.