[Civ. No. 23464. First Dist., Div. One. Dec. 20, 1967.]

CARLSON, COLLINS, GORDON & BOLD et al, Plaintiffs, Cross-defendants and Respondents, v. TERESA BANDUCCI et al., Defendants, Cross-complainants and Appellants.

Abraham Hochler and Charles M. Samson for Defendants, Cross-complainants and Appellants.

Nichols, Williams, Morgan & Digardi and Cyril Viadro for Plaintiffs, Cross-defendants and Respondents.

MOLINARI, P. J.—Plaintiffs, members of the law firm of Carlson, Collins, Gordon & Bold, a partnership, brought this action against defendants to recover $28,504.70 in attorneys' fees for legal services rendered on behalf of defendants in settling a will contest. Defendants denied that they owed money to plaintiffs and further cross-complained seeking to recover a payment of $19,000 allegedly made to plaintiffs under duress and undue influence. Judgment was entered on a jury verdict finding for plaintiffs and against defendants and awarding plaintiffs a total of $28,504 together with interest from the date of the filing of the action.[1] Defendants appeal from this judgment.

Defendants contend, essentially, that the evidence was insufficient to justify the verdict because as a matter of law the court should have treated certain documents as constituting the entire contract between plaintiffs and defendants and should have construed these documents as supporting defendants' theory of what the fee arrangement was between themselves and plaintiffs; that it was prejudicial error to admit evidence of the nature of the legal services performed by plaintiffs in the probate proceedings because this evidence was irrelevant to ascertaining the terms of the contract between plaintiffs and defendants and because its use violated the attorney-client privilege; and that the court improperly communicated with the jury through the court bailiff and that this irregularity constitutes reversible error. Defendants also allege numerous other errors dealing with the jury instructions, the size of the verdict, and other matters. We have concluded that there is no merit to any of the contentions and that the judgment should be affirmed.

[1] The judgment fails to mention or explicitly dispose of defendants' cross-complaint. It is plain from the general verdict for plaintiffs and against defendants, however, that the jury found that defendants were not entitled to recover anything on their cross-complaint. The jury verdict supporting plaintiffs' version of the fee arrangement between the parties is inconsistent with the possibility of defendants' recovering, under the cross-complaint, their payment made on account. Accordingly, although the judgment appealed from is not final because of its failure to dispose of the cross-complaint, we do not deem it desirable to dismiss the appeal on this basis. Rather, under the authority of *Gombos* v. *Ashe*, 158 Cal.App.2d 517, 524 [322 P.2d 933]; *Tsarnas* v. *Bailey*, 179 Cal. App.2d 332, 337 [3 Cal.Rptr. 629]; *Shepardson* v. *McLellan*, 59 Cal.2d 83, 89 [27 Cal.Rptr. 884, 378 P.2d 108]; and *Coronet Credit Corp.* v. *West Thrift Co.*, 244 Cal.App.2d 631, 634 [53 Cal.Rptr. 433], we amend the judgment by including therein an order that defendants are entitled to no relief on their cross-complaint.

## Facts

Defendants Teresa and Eleanor Banducci (hereafter referred to separately as Teresa and Eleanor) are mother and daughter; Eleanor formerly worked for plaintiffs' law firm as a secretary. Defendants hired plaintiffs as their attorneys in the matter of the estate of one John D'Avila, whose will defendants were offering for probate. In June 1961, relatives of D'Avila filed a will contest. Plaintiffs agreed to represent defendants in the will contest.

The relatives of D'Avila and defendants settled the will contest on January 16, 1962. According to the terms of the settlement agreement, the estate was to be divided, after payment of taxes and proper charges against the estate, as follows: 60 percent to the relatives and 40 percent to defendants. Pursuant to the settlement agreement, the relatives executed an assignment to defendants of 40 percent "of their respective distributive shares as heirs at law of said decedent." This share amounted to $279,952.43, out of which defendants paid $28,217.59 in estate and inheritance taxes, thus leaving a net in the sum of $251,734.84.[2]

The testimony of the parties conflicts as to the amount of attorneys' fees defendants agreed to pay plaintiffs for services in the settlement of the will contest. According to plaintiffs the matter of fees came up in a conference with defendants on June 23, 1961, at which defendants and plaintiff Collins agreed that Collins would charge $5,000 as a retainer, out of which he would pay costs, plus a fee of one-sixth of the entire gross estate, and that if nothing were recovered from the estate, the fee would be limited to $5,000. The testimony adduced on the part of defendants, on the other hand, was to the effect that the original agreement was for a $5,000 retainer plus $10,000 if the case was settled and $15,000 if it went to trial.

Subsequent to the conference of June 23, 1961, misunderstandings apparently arose on defendants' part as to what the fee arrangement was. In April 1963, Eleanor's brother, John Banducci, and a Mr. Trant asked Collins to advise defendants what his fee would be. Accordingly he wrote a letter to Eleanor on April 23, 1963 in which he stated that plaintiffs would be willing to accept Eleanor's understanding of the fee arrived at in a meeting with plaintiffs Collins and Gordon.

[2]The gross estate totaled $1,187,619.00.

That fee was "ten per cent of the forty per cent of the gross estate assigned to you and your mother under the terms of the settlement of the will contest."[3] Defendants did not immediately respond to this letter.

When the preliminary distribution of the estate was imminent, plaintiff Gordon wrote to defendants on November 26, 1963 that the attorneys' fees, computed on the basis of 10 percent of the gross estate, totaled $47,504.70. This sum amounted to 10 percent of 40 percent of the gross estate. Following the receipt of this letter Eleanor came to plaintiffs' law office where she stated to Collins that she had understood that the fee was to be 10 percent of defendants' net share. When Collins insisted that this was not his understanding, Eleanor asked for a courtesy discount in view of her former employment with plaintiffs. As a result of this conversation, Collins on December 4, 1963 stated to Eleanor that he would accept $38,000 as a fee if she would pay him $19,000 then and $19,000 on final distribution, but that if this offer was not agreeable to her then she would have to pay the full fee of $47,000. Collins also offered to reduce the $38,000 fee by $2,000, if defendants did not net $200,000 from the estate. A written memorandum of this conference, initialed by Gordon and dated December 4, 1963, states in part: "Fees to be paid from settlement check to total $38,000. . . . If Banducci's [*sic*] do not receive $100,000 each, then fee to be reduced $2,000, . . ."

Collins testified that at this conference Eleanor accepted his offer and agreed to pay a fee of $38,000 in the two specified installments of $19,000 subject to the reduction of $2,000 upon the specified contingency. Eleanor denied that she accepted the offer but did testify that the said offer was made. According to Collins, Eleanor paid him $19,000 out of the

[3]The letter, in relevant part, read as follows: "You will recall that on one occasion I suggested that a reasonable fee would be 16⅔ per cent, or one-sixth, of the gross estate assigned to you and your mother by reason of the settlement. At that time[*] you stated that George Gordon and I, at a meeting in this office, had agreed to accept a fee of ten per cent of the gross estate assigned to you and your mother. While George Gordon and I do not agree with this statement, we are willing nevertheless to adopt your own percentage rate. Accordingly, our fee for services in the will contest shall be ten per cent of the forty per cent of the gross estate assigned to you and your mother under the terms of the settlement of the will contest."

*Collins testified that the phrase "at that time" should have read "after that time."

preliminary distribution check. When the estate was finally distributed in February 1964, defendants were allocated the aforesaid distributive share of the estate in the sum of $279,-952.43, out of which they netted the sum of $251,734.84 after the payment of estate and inheritance taxes. Defendants refused to pay the balance of $19,000 claimed by plaintiffs, claiming that the total fee due plaintiffs was at most 10 percent of said sum of $279,952.43, or $27,995.24, against which they were entitled to a credit of the $19,000 paid out of the preliminary distribution check. The jury awarded plaintiffs a judgment in the sum of $28,504 representing the fee of $47,504.70 claimed by them less the $19,000 paid by Eleanor on account.

## The Agreement

Defendants contend that the entire contract of the parties consists of Collins' letter of April 23, 1963, which, they assert, incorporates the terms of the settlement of the will contest. The reference in the said letter to a fee of "ten per cent of forty per cent of the gross estate assigned to you and your mother under the terms of the settlement of the will contest," according to defendants, incorporates the terms of the settlement according to which the estate was to be divided "after payment of Federal and state taxes, California inheritance taxes, . . . and other proper charges against the estate . . . , as follows: Sixty percent (60%) to Contestants [relatives of D'Avila] and forty percent (40%) to Proponents [defendants], and for that purpose Contestants hereby assign to Proponents forty percent (40%) of Contestants' *distributive shares* as heirs at law of the decedent."[4] (Italics added.) Thus, defendants contend that the reference to "gross estate" in the subject letter means the defendants' *gross distributive share,* i.e., the sum of $279,952.43, and, accordingly, that as a matter of law the said letter and its supporting documents limit the fee to 10 percent of that sum, or $27,-995.24. In the light of this contention defendants assert that plaintiffs are not entitled to a fee of $47,504.70 representing 10 percent of 40 percent ($475,047) of the entire gross estate ($1,187,619).

■ It is elementary contract law that in order for there be be a contract there must be a meeting of the minds; mutual assent is necessary. (*German Sav. & Loan Soc.* v. *McLellan,*

---

[4]The phrase "distributive shares" is also used in the assignment from D'Avila's relatives to defendants.

154 Cal. 710, 716 [99 P. 194]; *Gold* v. *Gibbons*, 178 Cal.App. 2d 517, 519 [3 Cal.Rptr. 117]; *Lonergan* v. *Scolnick*, 129 Cal.App.2d 179, 182 [276 P.2d 8].) ▮ There is no meeting of the minds of the parties to a contract while they are still negotiating the terms of the agreement. (*Louis Lesser Enterprises, Ltd.* v. *Roeder*, 209 Cal.App.2d 401, 405 [25 Cal.Rptr. 917]; *Apablasa* v. *Merritt & Co.*, 176 Cal.App.2d 719, 730 [1 Cal.Rptr. 500].) ▮ In the instant case the jury was properly instructed that if an offer was made and accepted regarding the amount of attorneys' fees, then the agreement that resulted therefrom was binding on the parties. Accordingly, it was for the jury to determine whether the parties actually agreed on a fee, and, if so, what the fee was.

▮ The verdict that resulted can be supported on the following view of the evidence: The original oral contract was for a fee of one-sixth of the entire gross estate, as Collins testified, and said agreement was subsequently modified at defendants' request to a fee of 10 percent of 40 percent of the gross estate pursuant to the letter of April 23. ▮ A contract can, of course, be subsequently modified with the assent of the parties thereto (*Riverside Rancho Corp.* v. *Cowan*, 88 Cal.App.2d 197, 208 [198 P.2d 526]; *Barnes* v. *Western Pioneer Ins. Co.*, 151 Cal.App.2d 669, 671 [311 P.2d 871]), provided the same elements essential to the validity of the original contract are present. (*American Bldg. Maintenance Co.* v. *Indemnity Ins. Co.*, 214 Cal. 608, 615 [7 P.2d 305].) ▮ Here all of the individual plaintiffs testified that the modified fee arrangement was for $47,504.70. The letters of April 23, 1963 and November 26, 1963, are also evidence of that fact. True, all of this evidence is self-serving, but no written documents or other extrinsic evidence, self-serving or otherwise, support defendants' version of the fee arrangement. It is a reasonable inference, moreover, that Eleanor entered into a compromise agreement for a $38,000 fee because she knew that the then existing contract was for some sum greater than $38,000 and she hoped to obtain a courtesy discount. Collins' testimony that Eleanor agreed to pay $38,000 in two $19,000 installments, plus the fact that Eleanor did in fact make the first payment of $19,000 is sufficient to support a finding that a discounted fee of $38,000 was agreed upon by the parties. Moreover, at the time the compromise arrangement for a fee of $38,000 was admittedly discussed on December 4, 1963, the plaintiffs had fully per-

formed their contract since the will contest was settled in January 1962. If, in December 1963 defendants had a contract for a fee of either $10,000 or $27,995.24, they would have no reason to give in to a demand for $38,000.

■ The letter of April 23 was not an entire contract, nor was it the contract of the parties. It was merely evidence of an agreement between the parties. The trial court properly left its meaning to the jury. In view of the conflict in the evidence this letter could be construed as a negotiation of the amount of the fee or an attempt to modify the original contract. Accordingly, it could be interpreted as an offer from Collins to modify the original fee agreement or as an acceptance of a prior offer to so modify the original agreement. Moreover, the following facts tend to show that defendants subsequently acceded to Collins' offer of a fee of 10 percent of 40 percent of the estate: defendants did not respond at once, in protest, to the letter of April 23; defendants did not protest the letter of November 26, 1963, in which the fee was unequivocally stated to be $47,504.70; and defendants subsequently asked for a courtesy discount of the fee. Since there was evidence in the record that following the request for said discount Collins agreed to reduce his fee to $38,000, the jury could reasonably have concluded that had there been an agreement for 10 percent of defendants' gross distributive share, or $27,995.24, there would have been no reason to discount the fee to $38,000.

Insofar as the phrase in the letter of April 23, "assigned to you and your mother under the terms of the settlement of the will contest," is concerned, it is susceptible of the interpretation that it was intended to describe further the concept "forty per cent of the gross estate" in view of the testimony of each of the separate plaintiffs that Collins' fee calculations throughout all of the dealings of the parties were based on the entire gross estate.

■ Defendants seek to rely on the rule that attorney-client contracts drawn by the attorney are construed most strongly against him. (*Bartlett* v. *Pacific Nat. Bank,* 110 Cal.App.2d 683, 691 [244 P.2d 91]; *McClintock* v. *Bathurst,* 23 Cal.App.2d 647, 649 [73 P.2d 1237].) This rules does not compel a finding against the attorney, however, when other evidence shows that the intention of the parties was as the attorney contends. (*Bartlett* v. *Pacific Nat. Bank, supra,* at p. 691. See also *Houge* v. *Ford,* 44 Cal.2d 706, 711 [285 P.2d

257].) The jury was properly instructed that if there were any ambiguity as to the parties' intent, the agreement must be construed most favorably to defendants.

Here there was no evidence of duress; nor do defendants contend that the agreement found by the jury was unconscionable. The fee of $47,504 so found amounts to roughly 19 percent of defendants' net recovery of $251,734 from the estate, and is not, as a matter of law, unfair. (See *Hendricks* v. *Sefton*, 180 Cal.App.2d 526, 531-532 [4 Cal. Rptr. 218], and cases there cited.)

The cases of *Lane* v. *Wilkins*, 229 Cal.App.2d 315 [40 Cal. Rptr. 309] and *Parsons* v. *Bristol Dev. Co.*, 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839], relied on by defendants, do not affect our conclusions. *Lane* merely held that whether there is an ambiguity in a contract is a question of law and the trial court's finding thereon is not binding on appeal. *Parsons* holds that it is solely a judicial function to interpret a written instrument unless the interpretation turns on the credibility of extrinsic evidence, but that extrinsic evidence is clearly admissible to determine the circumstances under which the parties contracted and the purpose of the contract. That case did not require the trial court here to rule on the interpretation of a letter that was only evidence that the parties had agreed on a fee. The actual agreement rested partly in parol and it was up to the jury to determine the terms agreed upon.

### Evidence Pertaining to Legal Services Performed

Collins was permitted, over objection, to testify to the various charges made in the will contest that defendants exerted undue influence over D'Avila, such as that D'Avila had given Eleanor a trip to the South Seas, a new Cadillac, $10,000 in cash, a bond, and tickets for the Giants' games; that he had financed a trip to the Mayo Clinic for Teresa; and that Teresa would not permit D'Avila's lawyer to see him. Also, Collins testified that Eleanor had refused to submit to a deposition in the will contest and had requested Collins to settle the case. Further, he testified that Eleanor received a $65,000 gift from D'Avila; that no gift tax return was filed on the gifts to her; that he considered the D'Avila will an unnatural will; that the will was witnessed a month after it was signed, a suspicious circumstance; that John Banducci, Eleanor's brother, had tried to shake down a potential witness;

and that a concealment charge had been filed against Eleanor by the administrator of the estate. Finally, Collins testified to the number of office visits and phone calls with defendants.

All of this evidence was offered to show the obstacles faced by plaintiffs' law firm in settling the will contest. Defendants objected, first, on the ground that the value of plaintiffs' services is not relevant to the question of what the fee arrangement was, and second, that the testimony was given in violation of the attorney-client privilege. Defendants' motion for a mistrial based on the admission of the foregoing testimony was denied.

A line of cases holds that if the parties dispute whether there is an express contract, then evidence of the reasonable value of services to be performed under that contract is not admissible; but if it is admitted that there is a contract, but the parties disagree on the price to be paid under the contract, then evidence of reasonable value is admissible to show what price the parties are likely to have agreed on. (*Ellis* v. *Woodburn,* 89 Cal. 129, 132 [26 P. 963]; *People* v. *Crane,* 34 Cal.App. 760, 766 [168 P. 1055]; *Kurokawa* v. *Saroyan,* 95 Cal.App. 772, 777-778 [273 P. 613].) In this case, defendants testified that there was an agreement for $10,000 (if the case were settled), subsequently modified to an agreement for 10 percent of defendants' net cash share. Plaintiffs testified that the agreement was originally for one-sixth of the gross estate, subsequently modified to $47,504.70. Thus since the parties do appear to agree that there was an agreement for attorneys' fees, the foregoing cases authorize the admission of the evidence objected to to show what fee the parties are likely to have agreed on.

The court, however, instructed the jury that testimony as to the circumstances under which the D'Avila will was executed was offered solely to show the knowledge of the parties at the time the fee arrangement was entered into. This instruction does not precisely state the reason for the admission of the testimony. Nevertheless, since defendants requested this instruction, they cannot now complain of its defects.

Further, the foregoing testimony was admissible, in any case, to show that plaintiffs did not exert undue influence over defendants or otherwise take advantage of them and that the fee agreement testified to by plaintiffs was fair.

In California, an attorney carries a heavy burden to

demonstrate that any fee contract entered into with his client *after* the creation of the attorney-client relationship is fair and openly made since such a contract is presumed to be entered into under undue influence. (*Berk* v. *Twentynine Palms Ranchos, Inc.,* 201 Cal.App.2d 625, 637 [20 Cal.Rptr. 144]; *Lady* v. *Worthingham,* 57 Cal.App.2d 557, 560-561 [135 P.2d 205]; *Cline* v. *Zappettini,* 131 Cal.App.2d 723, 727 [281 P.2d 35]; *Cooley* v. *Miller & Lux,* 156 Cal. 510, 523-524 [105 P. 981]; *Cooley* v. *Miller & Lux,* 168 Cal. 120, 131 [142 P. 83]; *Setzer* v. *Robinson,* 57 Cal.2d 213, 216-217 [18 Cal.Rptr. 524, 368 P.2d 124].) ▆▆▆ Here the attorney-client relationship was created before the fee contract was entered into.[5] The trial court therefore instructed the jury, at defendants' request, that the highest degree of fairness and good faith was required of plaintiffs as attorneys in dealing with their clients; that if there were any unfair dealings, the burden of proof was on plaintiffs to show the honesty and good faith of the transaction and that it was entered into by their clients freely and voluntarily; that one who gains a thing by undue influence is an involuntary trustee of the thing gained; and that transactions between a trustee and beneficiary whereby the trustee obtains an advantage from his beneficiary are presumed to be entered into with undue influence and without sufficient consideration. It was thus vital for plaintiffs to be able to demonstrate that there were no unfair dealings, that the services performed for defendants were worth the fee charged, and that defendants freely and voluntarily entered into the fee contract. The evidence objected to was clearly admissible on this theory.

▆▆▆ Defendants now imply that they would not have requested the foregoing instructions had the above testimony been excluded. They did not, however, offer to stipulate to plaintiffs' fairness or to the absence of undue influence. The California law, therefore, required plaintiffs to rebut the presumption of undue influence by introducing evidence on this issue.

▆▆▆ The admission of the foregoing testimony, moreover, did not violate the attorney-client privilege. It is an established principle involving the relationship of attorney and

---

[5]The parties stipulated that an attorney-client relationship existed between them beginning when the petition for probate of the D'Avila will was filed, on May 23, 1961, and the earliest conference regarding fees took place June 23, 1961.

client that an attorney is released from those obligations of secrecy which the law places upon him whenever the disclosure of the communication, otherwise privileged, becomes necessary to the protection of the attorney's own rights. (1 Thornton, Attorneys at Law, § 127, p. 220; Evid. Code, § 958; *Arden* v. *State Bar*, 52 Cal.2d 310, 320 [341 P.2d 6] ; Canon 37, Canons of Prof. Ethics of the Amer. Bar Assn.) Accordingly, when, in litigation between an attorney and his client, an attorney's integrity, good faith, authority, or performance of his duties is questioned, the attorney is permitted to meet this issue with testimony as to communications between himself and his client. (Evid. Code, § 958; *Pacific Tel. & Tel. Co.* v. *Fink,* 141 Cal.App.2d 332, 335 [296 P.2d 843] ; *Fleschler* v. *Strauss,* 15 Cal.App.2d 735, 739 [60 P.2d 193] ; see Witkin, Cal. Evidence (2d ed. 1966) § 824, p. 771.)

 Defendants argue that the foregoing principles do not apply in this case because they did not introduce any evidence of undue influence or breach of duty on plaintiffs' part and hence the only issue was to determine the amount of the fee. The pleadings, however, raised the issue that Eleanor had made the $19,000 payment under duress and undue influence. Furthermore, the jury instructions requested by defendants on undue influence and on the fairness and good faith required of plaintiffs, referred to *supra,* placed in issue the fairness of the overall transaction whereby the fee was agreed on. Plaintiffs therefore had to show the nature of the services performed in order to establish the fairness of the agreement. The evidence referred to was necessary to the protection of plaintiffs' rights herein, since defendants questioned plaintiffs' good faith, and hence was admissible.

### Communication with Jury

 Defendants contend that the following circumstances constituted reversible error and that their motion for new trial on this basis should have been granted.

The affidavit of the bailiff and the statements of the trial court allege the following facts: After the jury had retired to the jury room, they buzzed for the bailiff and stated to him that they had voted eleven to one in favor of plaintiffs. The jury foreman then gave the bailiff written instructions to obtain the exhibits, although several jurors said that they did not need the exhibits. The bailiff advised the court that the jury stood eleven to one and wished to have the exhibits. The court sent a message to the jury through the bailiff that if they stood

eleven to one they had a verdict and did not need the exhibits. The jury then submitted its verdict without having looked at the exhibits.

Defendants introduced the affidavit of a juror stating that when the jury asked for the exhibits they had only taken a tentative vote and had not discussed the case in detail. Plaintiffs submitted jurors' affidavits tending to show that the jurors had reached a verdict and wanted to see the exhibits mainly out of curiosity.

We first point out that the affidavits of jurors may not be used to impeach their verdict except to show that the verdict was reached by lot or by chance and to show that the bias or disqualification of a juror was concealed by false answers on *voir dire*. (*Kollert* v. *Cundiff,* 50 Cal.2d 768, 772-773 [329 P.2d 897]; *Sopp* v. *Smith,* 59 Cal.2d 12, 14 [27 Cal. Rptr. 593, 377 P.2d 649]; *Smith* v. *Shankman,* 208 Cal.App. 2d 177, 184 [25 Cal.Rptr. 195].) Accordingly, the affidavit of the juror introduced by defendants cannot be used to show either that there was misconduct or that such conduct was prejudicial. In this connection we also note that the affidavits of the jurors introduced by plaintiffs are similarly inadmissible to show that the misconduct of one or more of the jurors did not influence their deliberations or decision. (*Anderson* v. *Pacific Gas & Elec. Co.,* 218 Cal.App.2d 276, 280-281 [32 Cal.Rptr. 328]; *Kimic* v. *San Jose-Los Gatos etc. Ry. Co.,* 156 Cal. 379, 397 [104 P. 986].)[6]

The evidence, exclusive of the jurors' affidavits, and consisting of the trial judge's admission and the affidavit of the bailiff was, however, admissible. Our inquiry, therefore, is to determine whether, as contended by defendants, the court's message to the jury given out of the presence of the parties constituted prejudicial error under Code of Civil Procedure sections 613 and 614.[7] These sections provide, in pertinent part, respectively, that jurors ". . . must not, before their verdict is rendered, communicate to any person the

---

[6]There is some authority that plaintiffs, the prevailing parties, may use the jurors' affidavits to disprove or explain the alleged misconduct, although not to show that the misconduct did not influence the jury's deliberations. (*People* v. *Chin Non,* 146 Cal. 561, 566 [80 P. 681]; *Kimic* v. *San Jose-Los Gatos etc. Ry. Co., supra,* 156 Cal. at p. 397; *People* v. *Yee King,* 24 Cal.App. 509, 511-513 [141 P. 1047]; see *Anderson* v. *Pacific Gas & Elec. Co., supra,* 218 Cal.App.2d.)

[7]Unless otherwise specified, all statutory references are to the Code of Civil Procedure.

state of their deliberations, or the verdict agreed upon,'' and that if the jurors, after retiring for deliberation, desire to be informed on any point of law they should be brought into court and the information required be given in the presence of or after notice to counsel.[8] A departure from these code provisions specifying the method of communication between the court and jury has been held to be an ''improper irregularity'' going to the substance of the right to jury trial, and ''because of its nature is deemed to be prejudicial except in very exceptional circumstances.'' (*Nelson* v. *Southern Pac. Co.*, 8 Cal.2d 648, 655 [67 P.2d 682]; see *Smith* v. *Shankman, supra,* 208 Cal.App.2d at p. 183; *Lewis* v. *Southern Pac. Co.*, 98 Cal.App.2d 358, 362-363 [220 P.2d 431].)

 The court's communication in the present case does not, however, appear to us to be the type of communication which is proscribed by the cited statutes in view of the provisions in section 613 permitting the bailiff to inform the court that the jury has reached a verdict and the provision in section 618 permitting the court to have the jury brought in to give its verdict. Once the court is informed that the jury has a verdict, nothing expressly prohibits the court from telling the jury that if it has a verdict it does not need to see the exhibits. The cases dealing with improper communications to the jury generally involve jury requests for information, answered by the court out of the presence of counsel. No case holds that a message like the one sent to the jury in this case is error.

 The rationale underlying the requirement that the court must not answer jury requests for information out of the presence of counsel is clear—to afford counsel the opportunity of knowing on what theories and in what manner the jury is instructed. But this rationale does not apply so strongly to a statement to the jury, after it has apparently

---

[8]These statutes read in relevant part as follows:

Section 613. ''When the case is finally submitted to the jury, . . . Unless by order of the court, the officer having them under his charge must not suffer any communication to be made to them, or make any himself, except to ask them if they or three-fourths of them are agreed upon a verdict, and he must not, before their verdict is rendered, communicate to any person the state of their deliberations, or the verdict agreed upon.''

Section 614. ''After the jury have retired for deliberation, . . . if they desire to be informed of any point of law arising in the cause, they may require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the parties or counsel.''

reached a verdict, that if it has a verdict it does not need to see the exhibits. If we assume that the bailiff, by stating that the jury stood eleven to one, had essentially informed the court that a verdict had been reached, and if we further assume from the facts stated in the bailiff's affidavit that a verdict had in fact been reached, it would appear that the trial court did not commit misconduct. While the bailiff did not plainly state to the judge that the jury had a verdict, it is plain that since he had the right to ask the jury under section 613 if they or three-fourths of them had agreed upon a verdict, his statement that the jury had informed him that they had voted eleven to one was tantamount to a statement that the jury had agreed upon a verdict.

 Even, however, if the court be deemed to have engaged in misconduct in its communication to the jury, such error is not necessarily prejudicial. (See *Smith* v. *Shankman, supra,* 208 Cal.App.2d at pp. 185-186 (error corrected at time verdict given); *Santina* v. *General Petroleum Corp.,* 41 Cal.App.2d 74, 77-78 [106 P.2d 60], and *Chambers* v. *Southern Pac. Co.,* 148 Cal.App.2d 873, 877-878 [307 P.2d 662] (jurors already agreed on a verdict, asking advice as to its form); *Tice* v. *Pacific Elec. Ry. Co.,* 36 Cal.App.2d 66, 72-73 [96 P.2d 1022, 97 P.2d 844] (parties stipulated that court might read any instruction to the jury on their request); *Lewis* v. *Southern Pac. Co., supra,* 98 Cal.App.2d at pp. 362-363 (judge sent bound collection of instructions to the jury, open at the requested one, and jury merely examined the one).) Under section 13 of article VI of the California Constitution a judgment shall not be reversed because of error as to any matter of procedure unless the reviewing court shall be of the opinion upon a review of all the evidence that the error has resulted in a miscarriage of justice. (See *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243]; *People* v. *Hamilton,* 60 Cal.2d 105, 120 [32 Cal.Rptr. 4, 383 P.2d 412].) In the present case defendants have not made any showing of fact which would justify this court in concluding that the asserted error resulted in a miscarriage of justice. As established independently of the jurors' affidavits, the jury had already voted eleven to one in favor of plaintiffs when the alleged error occurred. It is doubtful, moreover, whether the conduct of the trial court misled the jury or caused them to acquiesce in a verdict which did not represent their conclusions in view of the fact that when the

jurors were polled in open court after the verdict was returned all of them, except the juror-affiant who gave the affidavit presented on behalf of defendants, affirmed the verdict as written.

### Size of Jury Verdict—Instructions

Defendants make numerous other contentions. First, they contend that the verdict was excessive as a result of the passion and prejudice of the jury created by the admission of the testimony relating to defendants' conduct in the will contest. As we have above pointed out, this testimony was admissible. The verdict is supported by sufficient evidence and is not excessive.

Defendants' other contentions relate to jury instructions. Defendants claim, first, that the court erred in refusing to instruct the jury that the claims made in the complaint and the cross-complaint are not to be considered as evidence, and further erred in refusing to instruct on the amount of defendants' cross-complaint. Defendants also claim that the jury was not instructed on their version of the fee agreement nor that any overpayment could be returned to them.

The court did not instruct the jury specifically on either defendants' or plaintiffs' version of the fee arrangement, but left it to the jury to decide, under applicable principles of law, what the agreement was. This procedure was proper. The failure to instruct on the amount of the cross-complaint was similarly not error, and furthermore could not have been prejudicial in light of the verdict that was actually retured. (See *Grey* v. *Fibreboard Paper Products Co.*, 65 Cal.2d 240, 246 [53 Cal.Rptr. 545, 418 P.2d 153].)

The instruction that the pleadings are not evidence[9] might have been given, but the failure to give this instruction was not error in view of the fact that the court fully and correctly instructed the jury on its general duties. (See *Fava* v. *Pfahnl*, 158 Cal..App.2d 795, 800 [323 P.2d 552] ; *Dow* v. *City of Oroville*, 22 Cal.App. 215, 229 [134 P. 197].)

Defendants next complain of the refusal to give their proposed instructions numbers 24 and 25, which would have advised the jury that a trustee may not obtain any advantage, however slight, over his beneficiary (Civ. Code, § 2228), and that the duties of a trustee apply specifically to the attorney-client relationship. The jury was instructed,

[9]See BAJI 173-C.

however, on the definition of undue influence, on the degree of fairness and good faith required of plaintiffs as attorneys in dealing with their clients, and finally that one who gains a thing by undue influence is an involuntary trustee of the thing gained and that transactions whereby a trustee obtains an advantage from his beneficiary are presumed to be entered into under undue influence. While the instructions did not state precisely that the attorney acts as a trustee in relation to his client, we think that the jury must reasonably have understood that principle, since the instructions on the duties of a trustee were given directly after the instructions on the meaning of undue influence and on the duties of an attorney. Further, defendants' requested instructions on this aspect of the case were repetitious and tended to overemphasize the question of undue influnce. It is settled that the court need not give instructions that are repetitious (*Crooks v. Pirrone*, 228 Cal.App.2d 549, 554 [39 Cal.Rptr. 622]) or that unduly emphasize issues, theories, or defenses either by repetition or by singling them out. (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists, Local 1304*, 227 Cal.App.2d 675, 718 [39 Cal.Rptr. 64].) We note, moreover, that pursuant to an instruction submitted by defendants, the jury was instructed that if there were any ambiguity as to the parties' intent, the agreement must be construed most favorably to defendants. The instructions as a whole thoroughly informed the jury of the high burden of proof resting on plaintiffs to show that the fee arrangement was not the product of unfair dealings or undue influence. There is nothing contrary to this conclusion in *Hendricks v. Sefton*, 180 Cal.App.2d 526 [4 Cal.Rptr. 218] and *Huston v. Schohr*, 63 Cal.App.2d 267 [146 P.2d 730], cited by defendants.

 Defendants next complain of the refusal to give their proposed instruction No. 27, setting forth the requirement that an attorney must disclose to his clients all information in his possession as to material facts relevant to the contract between them. There was absolutely no evidence offered in this case of plaintiffs' nondisclosure of any facts whatsoever. Further, the instruction repeated unnecessarily that attorneys must exercise the highest degree of good faith. The refusal to give this instruction was therefore not error.

 The failure to give defendants' proposed instruction No. 29 (BAJI 8, revised), cautioning the jury as to their

proper attitude, was not error, since the jury was otherwise carefully instructed on its duties.

Defendants complain that the court did not advise the jury that an attorney-client contract is binding unless voidable because of undue influence. This point was adequately conveyed to the jury by instructions submitted by defendants and given by the court on undue influence, burden of proof, and rules of construction.

Finally, defendants contend that plaintiff's instruction No. 5, which the court gave, erroneously allowed the jury to determine whether the agreement between the parties was ambiguous. This instruction charged the jury that where the amount of attorneys' fees is fixed by an agreement which "is clear and free of ambiguity," then the attorney, after performing the services, is entitled to receive the fee fixed by the agreement and the jury is not to reconstruct the agreement or to apply any rule of interpretation or construction which favors the client over the attorney. As we have hereinbefore pointed out, the question of the terms of the agreement was properly for the jury because it involved conflicting testimony as to the facts tending to establish offer and acceptance. Under these circumstances, since the existence and terms of the contract could not be established as a matter of law, such agreement and its terms was for the jury's determination. The subject instruction, when read in the context of other instructions, charged the jury, essentially, that if, upon their resolution and reconciliation of the conflicting evidence, they determined that the agreement reached by the parties clearly fixed the amount of the fee, then they were not to reconstruct the agreement or apply the rule covered by another instruction, to the effect that if they concluded that there was "ambituity as to the intent of the parties, that construction should be adopted which is more favorable to the client."

The judgment is amended to include therein an order that defendants are entitled to no relief on their cross-complaint against plaintiffs, and as so amended, is affirmed. Respondents shall recover costs on appeal.

Sims, J., and Elkington, J., concurred.